Mottu, *et al., vs.* Primrose.

*Order affirmed and cause remanded.*

( Decided July 12th, 1865.)

THEODORE MOTTU, CHARLES W. GEORGE, and others, Managers of THE LOUDON PARK CEMETERY COMPANY, *vs.* WILLIAM F. PRIMROSE.

APPEALS: SUMMONS AND SEVERANCE.—Since the decision of the case of *Lovejoy vs. Irelan*, 17 *Md. Rep.*, 525, the law must be considered as settled, that where a judgment is rendered jointly against several persons, an appeal cannot be prosecuted by some of them, without the others, unless there be *summons and severance.*

By analogy to the practice at common law, in writs of error, the writs of *summons and severance*, in cases of appeals, must issue out of the Appellate Court.

——: ——: MOTION TO DISMISS.—If upon a motion to dismiss, for the non-joinder of a defendant in the appeal, the appellants move the Court for a writ of *summons and severance* against the non-joining defendant, the writ will be ordered, and the motion to dismiss overruled.

CORPORATIONS: ELECTIONS: POWER OF MANAGERS.—By the Act of 1852, ch. 221, sec. 2, to incorporate Cemetery Companies, it is enacted, "That the Company so incorporated may *annually elect* from its membership, by a majority of the votes of the proprietors, *at such time and place as its by-laws may specify*, its managers, said managers to have the power," &c.— HELD:

1st. That the object of this provision is to enable the board to carry out the intent of the Act, by securing an annual election, and not to authorize them to defeat that intent, by preventing such election.

2nd. That the power to fix the time for the annual election, cannot be construed into a power in the incumbents to extend their term of office indefinitely.

Where the board of managers, in order to defeat an anticipated change in the management, altered the day of election from May to November,

thereby extending their own term of office, for the alleged purpose of protecting the interests of the stockholders from their own apprehended mismanagement—HELD:

That while the minority of the stockholders are entitled to protection against the fraudulent or illegal action of the majority, that protection is not to be had by denying to the majority their right annually to elect the board of managers.

REMEDY OF INDIVIDUAL STOCKHOLDERS.—Any individual stockholder, if he is aggrieved by the refusal of the corporation to institute or continue proceedings for the redress of injuries to the corporation, has his remedy in equity against the corporation or the wrong doer.

JURISDICTION.—Where a Cemetery Company has its cemetery in Baltimore county, but the charter declares that the Company shall be located and its principal business transacted in Baltimore city, and the charter is acknowledged and recorded in Baltimore city, the Superior Court of Baltimore city will have jurisdiction over a case of *mandamus* against the board of managers of the Company.

MANDAMUS.—The by-laws of a corporation required that "at any meeting of the board of managers preceding the a nual election, *they shall appoint a judge and two tellers*, who shall, on the day of election, receive the votes," &c. The board of managers having illegally changed the day of election from the month of May to the month of November, an application was made for a *mandamus*, requiring the election to be held in May. The application being resisted, upon the ground that no previous demand was made upon the respondents to appoint a judge and tellers for the purpose of holding an election in May, and there having been no refusal by them to do so upon demand, the writ ought to be denied—HELD:

1st. That whatever may be the rule in the English Courts, the law and practice in Maryland, in such cases, do not require a previous demand and refusal, in order to support an application for a *mandamus*,—at least not in a case like the present.

2nd. That there may be some cases in which the Court, in the exercise of its discretion, would refuse the writ, where no previous demand and refusal had been made; as, where the claim of the petitioner, or the duty to be performed, is uncertain, or not clearly known to the respondent. But here the plain duty of the respondents was to provide for holding the election in May; the passage by them, in January preceding, of a resolution postponing the election till November, was an open and public declaration of their determination to defer it till that time, and to require of the petitioner a previous demand upon them to discharge their duty, would have been to require a useless and nugatory act.

——: NOTICE.—The application for the *mandamus* being further resisted, on the ground that the by-laws of the corporation required ten days' public notice to precede an election—HELD:

1st. That the respondents cannot be allowed in this case to urge said objec-

,tion, inasmuch as the necessity for a resort to the Court was caused by their own act, and the impossibility of a literal compliance with that by-law was also a consequence of the same wrongful act of the respondents.

2nd. That as the object of the application for a *mandamus* was to obtain a peremptory writ, requiring the election to be held on the third Monday in May 1865, the respondents had notice, in fact, from the time the petition was filed.

APPEAL BOND IN MANDAMUS CASE.—An appeal by the board of managers of a corporation from a judgment awarding a peremptory *mandamus*, requiring them to hold an election, is not a case in which an appeal bond is authorized to be given.

APPEAL from the Superior Court of Baltimore city:

The petition of the appellee for the writ of *mandamus*, filed on the 15th day of April 1865, states that the petitioner is a stockholder in Loudon Park Cemetery Company, to the extent of four hundred and eighty-nine shares, of the par value of $100 each; that said Company is a corporation created by a certificate in writing, under the hands and seals of James S. Primrose and ten others, dated the 22nd of February 1853, which was duly executed and acknowledged according to law, and recorded in the office of the clerk of the Superior Court of Baltimore city, under the provisions of the Act of 1852, ch. 221; that by the instrument of incorporation, the affairs of the corporation were to be conducted by a Board of six Managers, one of whom was to be President, and that said instrument having named the first Board, all succeeding Boards should be elected by the stockholders in said corporation; that the then Board was elected on the 3rd Tuesday of May 1864, to hold their offices for one year, and until their successors should have been elected, pursuant to the provisions of the Act of Assembly and the then existing By-Laws of the Company; that at the said election on the 3rd Tuesday of May 1864, a Board was elected, consisting of Thomas Wilson, James Carey Coale, Charles Shipley, Theodore Mottu, Charles W. George, and Thomas J. Myer; that by various changes the Board consisted, at the time of the filing of the petition, of Charles Shipley, President, James Carey

~loale, said George Mottu, William A. Fisher, and Joseph
~mas; that on the 1st day of May 1855, the day of elec-
· managers was fixed for the 3rd Tuesday of April,
and every year, and so continued up to the 13th
of April 1862, when the By-Laws were so altered as
fix the 3rd Tuesday in May, for such elections, and that
the elections of 1863 and 1864, were held accordingly; that
the said change was altogether owing to the more favorable
condition of the season in the month of May for the cus-
tomary visit to the Cemetery, and at the same time said
change was made, the regular quarterly meeting of the
Board was likewise changed from April to the same day in
May, and that the change of the annual election was ac-
quiesced in by all concerned; that on the 14. day of Jan-
uary 1865, at a meeting of the Board, at which were
present, Mr. Fisher, then President, and Messrs. Shipley,
George and Mottu, the said George and Mottu being broth-
ers-in-law of Shipley, it was resolved by the votes of Ship-
ley, George and Mottu, that thereafter the annual election
should be held on the 2nd Tuesday of November in each
year; that each shareholder is entitled to cast as many
votes as he has shares of stock; that the whole number of
shares in the hands of stockholders, is one thousand four
hundred and four, and that said Shipley and the members
of the Board, who passed said resolution, were aware or
apprehensive that the majority of stockholders had deter-
mined to turn out the then Board at the ensuing May elec-
tion, and that said resolution was originated to prevent the
exercise by such majority, of their right to change the
management, for the fraudulent purpose of continuing
the then Board several months beyond their time; that no
notice was at the time given of the passage of the resolu-
tion, and it was designedly withheld from the knowledge
of the petitioner, who is the largest shareholder, and of
other large shareholders, in order to prevent any timely
proceedings by them, and that the petitioner only heard of
it on the 12th of April 1865, and that the parties concern-

ed in the passage of the resolution, having learned that it had come to the petitioner's knowledge, and apprehending proceedings on his part, did, on the 14th day of April, cause a notice thereof to be published in the "Sun" and "American" newspapers.

The petitioner then alleges that the resolution was illegal and unauthorized; but that the Managers proposed to hold it valid, and meant to act accordingly, and would not hold an election on the 3rd Tuesday of May, or make the necessary preparations, and it concludes with a prayer for the *mandamus.* A copy of the By-Laws accompanied the petition. James Carey Coale filed his answer assenting to the prayer for the *mandamus.*

The answer of all the other defendants, admitted that the Company was incorporated under the Act of 1852, ch. 221, and the recording of the articles in the office of the clerk of the Superior Court, &c., but averred that the real estate of the Company and all its personal property, except the furniture of an office, was located in Baltimore county, and insisted upon the want of jurisdiction in the Court to grant the writ.

The answer then states, that the 1st By-Law of the Company, adopted by the first Board of Managers, April 13th, 1853, provided that the Board should be elected by the proprietors and stockholders at the annual meeting, on the 1st Tuesday of April in each year, and should hold office one year, and until the election of their successors, but on the 3rd of October 1853, the By-Law was so amended as to cause the election to be held on the 1st Tuesday of November in each year; that on the 2nd day of November following, the amending resolution was repealed, and the By-Law again amended, so as to cause the election to be held on the 1st Tuesday of April, and on the 1st of May 1855, said By-Law was again altered, so that the election should occur on the 3rd Tuesday of April, and on the 15th day of April 1862, it was again amended, so as to make the election occur on the 3rd Tuesday of May; and that all

such changes were made by the Managers, and the last, whilst the petitioner was Secretary to the Company.

The respondents admit that the elections, since the 15th of April 1862, had been held on the 3rd Tuesday of May, deny all knowledge of the motives for the changes, and aver their belief that they were made on account of what was from time to time supposed to be the interest and convenience of the Company.

The answer admits the passage of the resolution of January 15th, 1865, and their intention to act under it, and avers that neither the petitioner nor any one else, had ever demanded or requested that they should do otherwise; it admits the passage of the resolution by the votes of the three members mentioned in the petition, and denies all fraud and concealment of the resolution, or of notice thereof, and avers that it was passed at a meeting, called in the usual manner, of which, each member had written notice, that it was entered at large on the minute book, and the proceedings of such meeting were read at the next meeting; it avers that at the time of the resolution, it was their purpose to give notice of the same in two daily papers of the city, a month or more before the 3rd Tuesday of May, and that said Fisher, then President, had ten days prior to the meetings of April 10th, 1865, intended to publish the notice, but did not then do so, because such meeting, the last for some time, was to be held, and it was thought best to make the publication shortly afterwards, and it avers that it is not true that the notice was given, because the fact of the passage of such resolution had become known to the petitioner, or because of any apprehension of legal proceedings on his part, but that on the contrary, the notice was given, as long before intended and advised by the then President, and at the time it was ordered, the Managers neither knew nor anticipated that the petition would be filed; that in the passage of the resolution objected to, the Managers acted under the powers conferred upon them by the 2nd section of the Act of 1852, ch. 221, and in accord-

ancé with the long settled practice of the Company, and they deemed it right to give notice of the change, though none had been given of former changes, and that the Managers have a right to fix such times for holding elections as they fairly deem best.

The answer further states, that the 1st Board consisted of Jas. S. Primrose, John McDowell, Jr., J. Q. Guinido, E. Livezey, Wm. C. Coale, and G. A. Thompson, and said James S. Primrose was elected first Secretary, and acted as such until November 1855, and McDowell, Guinido and Primrose, all continued to be members of the Board until the election of 1856, and the two former until displaced by the stockholders in May 1864, except that McDowell was out during part of 1855 and 1856, and that during the whole of such period said three parties, and afterwards, the two former had the full control and management of the Company's affairs; that on the 1st of May 1855, at a meeting, at which were present, Henry A. Thompson, President, McDowell, Guinido, J. S. Primrose and James Shriver, a resolution was passed allowing stockholders to convert their shares into burial lots in the Cemetery, to hold the same for their own profit, and the Secretary was directed to endorse, when so requested, upon the certificates, that the shares therein represented, were so convertible at the option of the holder; and that immediately thereafter, on the same day, the said James S. Primrose, Guinido and McDowell endorsed, and caused to be endorsed, their own stock, but never gave the defendants or the other stockholders, any notice whatever, of the passage of the resolution, but purposely withheld such information, in order to obtain a fraudulent advantage; and that, on the 28th of August, then following, so much of the resolution as permitted said endorsement upon the certificates, was repealed, so that the then members of the Board of Managers only obtained such endorsement, and in September 1856, the whole resolution was repealed, the reason assigned being, that it was operating disadvantageously to the Company; but that notwith-

standing such repeal, and the reason assigned for it, Guinido and McDowell, on the 5th day of October 1861, caused a resolution to be passed, allowing only holders of endorsed stock to take up lots, although they were, themselves, the holders of all or nearly all the endorsed stock; that the defendants and a large body of the stockholders, were refused all access to the books, although demand was often for such purpose made on the Company's officers, of whom the petitioner was one, and remained ignorant of the precise character of the proceedings of the said Board of Managers until after the election of 1864, though they had learned shortly prior to that time that the Managers were dividing the Company's property among them; that under the pretended authority of the said resolutions, McDowell, Guinido, J. S. Primrose, and one or two others, who were in their interest in the passage of the resolutions, have obtained so called deeds, and are claiming to own the most valuable lots in the Cemetery, and have been competing with the Company in the sale of lots; that at a meeting held on the 2nd of April 1855, a resolution was passed authorizing the President and the Secretary, said James S. Primrose, to obtain a loan for the Company, of from $5,000 to $7,000, and that in pretended execution of such authority, said Primrose, at the request of McDowell, forwarded to a broker in Philadelphia, the notes of the Company, at twelve, fifteen and eighteen months, respectively, amounting, in the aggregate, to the sum of $8,000, together with notes at six, nine, twelve, fifteen and eighteen months, for interest at the rate of $1\frac{1}{2}$ per cent. per month, amounting to $2,300, and McDowell, in accordance with a concerted plan, received the notes from the broker for the benefit of himself, Guinido, Primrose and B. L. Woolston, then also a member of the Board, and advanced $8,000, and in further aid of the same plan, and without any action of the Board, McDowell, Guinido, James S. Primrose and Woolston, caused a deed to be drawn and executed from the Company to McDowell, in trust for himself and the three

62      v.23.

others, purporting to convey absolutely, a large part of the Cemetery, but that Mr. Thompson, the President, who had not shared in the profits of the loan, and was desirous that there should be some evidence of the purpose of the deed, caused another instrument to be prepared, reciting the fact that the deed was intended merely as a security for the money advanced, and caused the same to be sent to McDowell for execution, at the same time that he transmitted the executed deed, but McDowell and the said other parties, have failed or refused to execute said instrument, while they have retained the deed, and are by virtue of it, fraudulently claiming to be owners of another large part of the Cemetery; that in the early part of August or September last past, bills had been filed by the Company on the equity side of the Circuit Court for Baltimore county, against McDowell, Guinido, and other parties holding under them, in order to obtain a decree setting aside the fraudulent location of lots, and annulling the pretended deeds, and that though an appearance was soon after entered, they had failed to file any answer, and that the defendants are constrained to believe that they had interposed delays in the hope of being able to seize upon the management of the Company, and thus to prevent an investigation of their fraudulent acts; that the petitioner is the nephew of James S. Primrose, and, it is believed, of Guinido also, and that he was elected secretary by them in the year 1862, and so remained until displaced by the defendants in November 1864; that he had been fully cognizant of all the proceedings of said McDowell, Guinido, and others, and some of the fraudulent locations were made during his secretaryship, and that the defendants have been informed and aver, that he is himself the actual holder of a large number of such fraudulently obtained lots, and that he was without the knowledge of the defendants, and in defiance of their orders, selling or endeavoring to sell the same, whilst acting as secretary under them; that he has had full notice and knowledge of the filing of the said bills

in Baltimore county, employed counsel for said McDowell, and others, and aided in the defence of such suits, and that it has been the purpose of the petitioner, in order to protect the title of himself, said Guinido, and others, to said located lots, to obtain control of the Board of Managers, in order to direct a dismissal of said suits before the same can be brought to trial; that it is true the petitioner is the holder of the shares stated in the petition, but that the petitioner was the Company's Secretary, at a small salary, and that the respondents have reason to believe that the said shares, though in his name, were really purchased with money furnished by said Guinido or J. S. Primrose, or both of them; that the par value of the shares is $100, but that on account of said frauds of Guinido, and others, the stock had, when the respondents were elected, ceased to have any market value whatever, but that after their investigation had been made, and their bills had been filed with some prospect of regaining the property, of which the Company had been stripped, some little improvement in the stock occurred, and hence, the petitioner paid about $12 or $13 for the stock purchased by him; that the petitioner has bought stock sufficient to give him, in connection with said McDowell and others, a majority, but that the same was purchased for the fraudulent purpose of preventing a trial of the causes pending. in Baltimore county, and of confirming such fraudulent title, and that the respondents deemed that the interest of the Company required that such fraudulent scheme should be defeated, and that the election, should be postponed, that the cases may be tried, and for such purpose only, and not for any benefit to the respondents, the change was made. The answer then denies all fraud and concealment.

To this answer the petitioner demurred, and the Court (MARTIN, J.,) ordered the *mandamus*, whereupon, the respondent appealed.

The defendants, having prayed an appeal from the judgment of the Court ordering the *mandamus*, requested the

Court to fix the penalty of an appeal bond, and the Court declined to do so, whereupon, the defendant also prayed an appeal from such a refusal.

The appellee moved a dismissal of the appeal, for the non-joinder of James Carey Coale, one of the defendants, and the appellants then moved the Court for a writ of summons and severance against said Coale.

The motion to dismiss, was argued before BOWIE, C. J., BARTOL, COCHRAN and WEISEL, J.

*J. Mason Campbell* and *B. Carter*, for the motion cited: *Lovejoy vs. Irelan*, 17 *Md. Rep.*, 531.  *Kuyaston vs. Mayor &c., of Shrewsbury*, 2 *Str.*, 1052.

*Thos. S. Alexander* and *Wm. A. Fisher*, against the motion cited:

*Tapp. on Mand.*, 77 *Law Lib.*, 341, 368.  2 *Todd Pr.*, 1189, 1190.  4 *Bac. Abr.*, 335.  2 *Wm. Saunders*, 101 *f.*, 101 *g.*  *Ruddock's case* 3 *Coke*, 307, *part* 6, *folio* 25.  *Quynn vs. Carroll's Admr.*, 22 *Md. Rep.*, 288.

BARTOL, J., delivered the opinion of this Court:

In this case, the judgment below was rendered against six defendants, and the appeal has been taken by five of them only; and the appellee has moved to dismiss the appeal, on account of the non-joinder of the other defendant. Since the decision of the case of *Lovejoy vs. Irelan*, 17 *Md. Rep.*, 525, the law must be considered as settled, that where a judgment is rendered jointly against several persons, an appeal cannot be prosecuted by some of them, without the others, unless there be summons and severance.

This rule rests not only upon authority, but is founded in reason and justice; otherwise the consequence might be, that in a judgment against six persons, there might be six distinct and separate appeals, and, in the language of *Tidd*, (*Practice*, 2 *vol.*, 1189, when speaking of writs of error,) "by that means the plaintiff would be delayed from his ex-

Mottu, *et al.*, *vs.* Primrose.

ecution for a long time, and from having any benefit of his judgment, though it might be affirmed once or oftener." The effect of the application of this rule to the present case, would be, under the authority of *Lovejoy vs. Irelan*, to compel us to gratify the motion, and dismiss the appeal. But the counsel for the appellants, to obviate the difficulty, have moved this Court to direct a summons now to be issued against the party who has not joined, requiring him to come into this Court and unite in the appeal; and, on his failure to do so, that his co-defendants may be severed, and allowed to prosecute the appeal alone.

This presents the question, from what Court the writ of summons and severance properly issues? Neither the case of *Lovejoy vs. Irelan*, nor the case of *Price vs. Thomas*, 4 *Md. Rep.*, 515, settles this question. In *Price vs. Thomas*, the objection was obviated by a correction of the record, and in *Lovejoy vs. Irelan*, no motion for the writ appears to have been made in the Appellate Court. The inference drawn by the appellee's counsel from the language of the Court in those cases, "that the writ must be issued from the Court where the judgment has been rendered, and that a severance is a necessary preliminary to the taking of the appeal," we think is not warranted either by those decisions, or by the established practice in such cases.

After a careful examination of our books of Maryland practice, we have been unable to find any evidence of the practice in this State on this subject. Neither in *Harris' Entries*, our old and justly respected book of forms, nor in the modern compilation of the same book, by *Mr. Evans*, or in his work on *Practice*, do we find any reference to the writ of summons and severance. In the English practice, the writ is well known, and will be found treated of as well in standard elementary works as in the reported cases cited by the authors of books of practice. See 1 *Archbold Pr.*, 233, 2 *Tidd*, 1189, 1225. 2 *Saund. Rep.*, 101, *sec.* 101 *g*, *notes*.

It appears, from these authorities, that the practice in

writs of error required that "they should be brought in the name of all the parties against whom the judgment is given, that it may agree with the record," * * * * * "and if any one or more of them refuse to appear and assign errors, they must be summoned and severed, and then the writ of error may be proceeded in by the rest only." 2 *Saund. Rep.*, 101 *g, note*. See, also, authorities there cited.

From an examination of the authorities, it is plain that, according to the practice at the common law in writs of error, the writ of summons and severance was issued out of the Appellate Court. In our system, where appeals have been allowed by statute, and have been adopted almost entirely in place of writs of error, they are to be proceeded in according to the same rules as governed writs of error; and in the absence of any established practice in our State to the contrary, or any adjudication by the Court of Appeals on the subject, we feel ourselves warranted in deciding the present motions in conformity with the English practice and authorities, and therefore overrule the motion to dismiss, and will order a writ of summons and severance, in the usual form, to be issued against James Carey Cole, the non-joining defendant.

> *Motion to dismiss overruled, and writ of*
> > *summons and severance ordered.*

(Decided October 6th, 1865.)

The appeal in this case was argued before BOWIE; C. J., and BARTOL, GOLDSBOROUGH, COCHRAN and WEISEL, J.

*Thos. S. Alexander* and *Wm. A. Fisher*, for the appellants, contended:

1st. That the Company's real and personal estate being situate in Baltimore county, the Superior Court of Baltimore city had no jurisdiction to grant the writ. 3 *Bland*, 656, *Cape Sable Company's case*.

2nd. That no demand having been made upon the respondents to appoint a judge and tellers, and there having

been no refusal by them, the application should have failed. *Tapping on Mand.*, 76 *Law Lib.*, 282, 52 *n.* 84 *n.* (*i.*) 285. *R. vs. Breakneck Canal*, 4 *N. & M.*, 871.   *R. vs. W. Love*, 3 *Barn. & Cress.*, 677.   *R. vs. Bristol & Essex R. R.*, 4 *Adol. & Ell.*, *N. S.*, 162.   *R. vs. Nottingham*, 3 *Adol. & Ell.*, 503.   *R. vs. Frost*, 8 *Adol. & Ell.*, 826.   *R. vs. Wilts. Canal*, 8 *D.*, 623.   *R. vs. Montacute*, 1 *W. Black's Co. Bacon's Abr.*, *Mandamus*, (*D.*)

3rd. The application should have been to compel the repeal of the present, and the re-enactment of the former by-laws, and then to appoint the judge and tellers under the latter. *Tapping on Mand.*, 282.

4th. The 8th by-law requires that ten days' public notice shall precede an election; and as such notice could not have been given between the date of the filing of the petition and the third Tuesday of May, the petition should have been dismissed. *Ellicott vs. Levy Court*, 1 *H. & J.*, 359.   *Tapping on Mand.*, 15.   *Rex vs. Wilts. Canal*, 3 *Adol. & Ell.*, 477.   *Smith vs. Erb*, 4 *Gill*, 459.   *Rex vs. May*, 5 *Burr.*, 2681.   *In matter of Long Island R. R.*, 19 *Wend.*, 38. *Wilcox on Corp.*, 14 *Law Lib.*, 42.

5th. That the alteration of the by-laws was made in the exercise of the legitimate authority of the Board of Managers. Act of 1852, ch. 221, sec. 2.   *Angell & Ames on Corp.*, 357.   *Paxson vs. Sweet*, 1 *Green* (*N. J.*) *Rep.*, 196. *Newling vs. Francis*, 3 *Term Rep.*, 198.   *Foot vs. Mayor of Truro*, 1 *Strange Rep.*, 625.   2 *Kent's Com.*, 295.   *Hughes vs. Parker*, 20 *N. H. Rep.*, 58.

6th. That the discretion of the Board over the subject was properly exercised in the passage of the amendment to the by-laws, inasmuch as it was done for the purpose of preventing the consummation of frauds contrived by former Boards, in privity with the petitioner.   In support of this point, the respondents will rely upon the various facts detailed in the answer, the truth of all which is admitted by the demurrer.   *Corporation cases*, 4 *Coke's Rep.*, 78.   *Com. vs. Cain*, 5 *S. & R.*, 510.   *Hoffman, &c., vs. Cumberland Canal & Iron Co.*, 16 *Md. Rep.*, 507.

7th. The Court possesses a legal discretion to grant or refuse the writ, and such discretion is never exercised to assist fraud. *Evans' Prac.*, 408. 4 *Bac. Abr.*, 496. *Tapping on Mand.*, 16, 28.

8th. The Court erred in refusing to fix the penalty of an appeal bond. Code, Art. 5, secs. 3, 10, &c.

*J. Mason Campbell* and *Bernard Carter*, for the appellee:

1st. The Loudon Park Cemetery Company was incorporated on the 22nd of February 1853, under the general incorporating law of 1852, ch. 221. The charter is filed as an exhibit with the petition; and by the first article of that charter, it is declared that the corporation shall be located, and its principal business transacted, in the city of Baltimore. The charter is acknowledged before the Judge of the Superior Court of Baltimore city, and recorded in the office of the Clerk of that Court. This is sufficient to show that this Court has jurisdiction of this case.

The objection taken in the answer of the defendants, that the Cemetery itself is situated in the county, will not affect the question. The first section of the Act of 1852, ch. 221, forbids the holding of any ground in the city for burial, while it allows the incorporation to be made and located in the city.

The second section of the Act of 1852, ch. 221, declares that the Company may annually elect its Managers from its members, by a majority of the votes of the proprietors, at such time and place as its by-laws may specify. The charter of the Loudon Park Cemetery Company fixes the number of Managers at six; and it was under a by-law in existence on the third Tuesday of May 1864, fixing the time of election, that the present Board were elected on that day, to hold their office for one year from that date, and until their successors should be elected.

The enabling Act of 1852, ch. 221, only gives power to the corporations coming into existence under it, to make annual elections; but it is immaterial to consider this ques-

tion. This Company undoubtedly had power to hold an annual election under its by-laws, and by its by-laws in existence on the third Tuesday of May 1864, it held an election, by which it invested the Managers then elected with capacity to exercise their functions for a period of twelve months. The present Board took office accordingly; and the inquiry resolves itself into this: whether officers elected for a special and limited term, have the power to extend their term at pleasure? If the present Board, by its own act, can hold office until November 1865, having been elected to hold till May 1865, there is nothing to prevent their extending their term to May 1866, and so on, *ad infinitum*. The power is to be found, if anywhere, in the authority given to the Managers to specify in a by-law the time of the annual election. Nothing can be plainer than that the object of such a provision is to facilitate the holding of an annual election, and not thereby to enable the Managers to prevent such annual elections.

In this instance, an election had been held, and the stockholders had declared the term for which the Board was to serve. No exercise of power on the part of the Board could be meant to have a retrospective effect. Of what avail was it to elect a Board for a definite period, one year, if as soon as they came into office, their authority was to be so construed as that they could undo the past action of the stockholders, and make the limitation on their term of service a nullity?

Undoubtedly the Board of Managers have the power to fix the time of the annual election; but the construction of that power must not overturn the principles on which alone corporations can safely be carried on. All of them, without exception, limit the term of office of those invested with the management of the corporate affairs; and no interpretation of their powers can be a safe one, which invests them with a capacity to perpetuate themselves in office. Independently of the changed management so essential to the

safety of all corporate bodies, no scope can be allowed by law for the abuse of official power for the benefit of incumbents. *Hoffman Steam Co. vs. Cumb. Coal & Iron Co.,* 16 *Md. Rep.,* 507, 508. *Grant on Corp.,* 77, 91.

2nd. The answer alleges the existence of frauds perpetrated by members of former Boards, which are now the subjects of equity suits instituted by the Company; and charges that it is the object of the petitioner, in collusion with the perpetrators of those frauds, to get possession of the Company, in order to dismiss the suits. It is conceded by the answer, that the petitioner and those who are alleged to act with him, own a majority of the stock of the said corporation; and the objection consequently concedes that a change of management at the next election is desired and intended by the parties entitled to it, but that the present management for what they pretend to think for the interests of the stockholders, can properly interfere to prevent the stockholders making the change they contemplate.

The Managers are merely agents for the stockholders, and the principals have the right to manage their affairs as they, and not as their agents, think best.

It is not very probable that the parties affected injuriously by a fraud, will abandon the proceedings for its redress, but if they do, it is their own affair, and, at all events, a Board of Managers, in order to save the stockholders from themselves, have no right to deprive the stockholders of their privilege of an annual election given to them by their charter. If it be said that the minority of the stockholders are entitled to protection against the action of the majority, the legal mode of protection is not by denying the majority their right annually to elect their Board of Managers. Any individual stockholder, if he is aggrieved by the refusal of the corporation to institute or continue proceedings for the redress of injuries to the corporation, has his remedy in equity against the corporation and the wrong-doer. *Dodge vs. Woolsey,* 18 *How.,* 331.

Mottu, *et al.*, *vs.* Primrose.

BARTOL, J., delivered the opinion of this Court:

When this case was argued some reasons were suggested, why an immediate decision was necessary; the proceedings were considered, and this Court being of opinion that there was no error in the ruling of the Superior Court, upon the questions presented by the record, directed that the order appealed from should be affirmed. We now proceed to state, briefly the grounds of our decision :

By the second section of the Act of 1852, ch. 221, under which the Loudon Park Cemetery was incorporated, it is provided, that the Company may, at such time and place as its By-Laws may specify, *elect annually*, a Board of Managers, &c. The charter declares that the Board shall consist of six persons.

On the 3rd Tuesday of May 1864, the time fixed for the annual election by the By-Law, then in force, the appellants were elected Managers, to hold their office for one year, and until their successors should be elected and qualified.

On the 14th day of January 1865, at a meeting of the Board, at which were present four of their number, being a quorum, it was resolved, that thereafter, the annual election of Managers; should be held on the 2nd Tuesday in November of each year. The effect of that resolution, was to extend the term of office of the Board, six months beyond the time for which they had been elected; and the main question in the case is, whether the passage of that resolution was a valid exercise of authority on the part of the Board of Managers.

It is contended, that their power to pass the "resolution, is to be found in the authority given to them to specify in a By-Law, the time for the annual election. It is plain that the object of this provision is to enable the Board to carry out the intent of the Act, by securing an annual election, and not to authorize them to defeat that intent, by preventing such election. The power to fix the time for the annual election, cannot be construed into a power in

the incumbents, to extend their term of office indefinitely, so to hold would defeat the provisions of the charter, and overturn the principles upon which, alone, the corporation can be safely carried on, by depriving the stockholders of the right secured to them by law, of controling the management of the Company.

In our opinion the passage of the resolution of the 14th of January was not warranted by the terms of the charter, and not justified by the grounds and reasons set forth in the appellants' answer."

It is alleged in the answer, "that frauds upon the Company had been committed by members of former Boards, which were the subject of suits in equity, pending in the Circuit Court for Baltimore county; and the answer charges substantially, that it is the object of the petitioner, in collusion with the parties by whom those frauds had been perpetuated, to get control of the Company, in order to dismiss those suits, and thus prevent an investigation of their fraudulent acts; and the answer alleges that the respondents deemed that the interest of the Company required that such fraudulent scheme should be defeated; and that the election should be postponed, that the cases may be tried, and for such purpose only, and not for the benefit of the respondents, the change was made."

The inference from this answer is, that the petitioner, and those who are alleged to act with him, own a majority of the stock, and consequently, a change of management would be effected at the next election, by those entitled to make such change; but, in order to defeat such change, the Board of Managers altered the day of election from May till November, thereby extending their own term of office; for the alleged purpose of protecting the interests of the stockholders from their own apprehended mismanagement. But the Board of Managers are merely agents, and the right of determining who shall constitute the Board, belongs not to them, but to the stockholders, who are their principals.

The argument of the appellee on this point is conclusive.

"While the minority of the stockholders are entitled to protection against the fraudulent or illegal action of the majority; that protection is not to be had by denying to the majority, their right annually, to elect the Board of Managers." Any individual stockholder, if he is aggrieved by the refusal of the corporation to institute or continue proceedings for the redress of injuries to the corporation, has his remedy in equity against the corporation or the wrongdoer. *Dodge vs. Woolsey*, 18 *How.*, 331.

Some technical objections to the granting of the writ have been presented by the appellants, which it is necessary to notice :

1st. It is contended, that the real and personal estate of the Company being situated in Baltimore county, the Superior Court of Baltimore city had no jurisdiction in this case. Though the Cemetery is situated in the county, by the charter it is declared, that "the Company shall be located, and its principal business transacted, in Baltimore city." The charter was acknowledged and recorded in the city, and we have no doubt of the jurisdiction of the Superior Court over the case.

2nd. It is objected that no previous demand was made upon the respondents to appoint a judge and tellers, for the purpose of holding an election in May, and there having been no refusal by them so to do upon demand, the writ ought to be denied.

Whatever may be the rule in the English Courts, the law and practice in Maryland, in such cases, do not require a previous demand and refusal, in order to support an application for a *mandamus*, at least, not in a case like the present. See, *Runkel vs. Winemiller*, 4 *H. & McH.*, 431. *Ellicott vs. Levy Court*, 1 *H. & J.*, 359. *Brosius vs. Reuter*, *Id.*, 480. *Smith vs. Erb*, 4 *Gill*, 442. See, also, 37 *Pa. Rep.*, 246.

The writ not being *ex debito*, but in all cases resting in the sound discretion of the Court, there may be some cases in which the Court, in the exercise of its discretion, would

refuse the writ where no previous demand and refusal had been made; as where the claim of the petitioner, or the duty to be performed, is uncertain or not clearly known to the respondent. Such, however, is not the case here. The plain duty of the respondents was, to provide for holding the election in May; the passage by them of the resolution of January, was an open and public declaration of their determination to defer it till November, and to require of the petitioner a previous demand upon them to discharge their duty, would have been to require a useless and nugatory act.

3rd. The objection founded upon the terms of the 8th By-Law, which required ten days' public notice to precede an election, is one which the appellants cannot be allowed to urge in this case. Inasmuch as the necessity for a resort to the Court was caused by their own act; and the impossibility of a literal compliance with that By-Law, was also a consequence of the same wrongful act of the respondents.

The purpose of the application, was to obtain a peremptory writ, requiring the election to be held on the 3rd Tuesday in May 1865, so that the appellants had notice in fact, from the time the petition was filed.

We concur in the opinion expressed by the Judge of the Superior Court, that this is not a case in which, under the Code, an appeal bond is authorized to be given.

*Order affirmed.*

( Motion to dismiss decided, and summons and severence ordered October 9th, 1865. See p. 494; and appeal decided November 2nd, 1865.)