AUGUSTUS G. DAVIS, and others *vs.* THE UNITED
STATES ELECTRIC POWER AND LIGHT COMPANY OF
BALTIMORE CITY, and others

*Corporations—Right of one Corporation to Acquire and
Vote the Shares of Stock of another Corporation—Grounds
for Appointment of Receiver—Insufficiency of Proof of
Fraud.*

As one corporation may purchase and hold stock in another cor-
poration, it is entitled in the absence of any restriction contained
in the charter, as an incident to the ownership of the stock, as
well as by the express terms of the statute, to have a vote at all
meetings of stockholders for each share of stock it may hold.

It would be a fraud of the most flagrant character for a corpora-
tion, after obtaining control of the management of another cor-
poration to use its power to make the latter corporation subser-
vient to its own interest, to use it as a feeder, and finally utterly
to destroy it whenever it should be to its interest to do so.

Such conduct would subject the corporation at whose instance the
scheme was devised and executed, not only to a civil liability for
the injury done, but also to the penalties of misuser or abuser
of its franchises; and in such a case Courts can be neither too
emphatic in condemning the act, nor too ready to afford the
strongest remedy allowed by law for the prevention or redress
of the wrong.

The power of appointing a receiver is a discretionary one, to be
exercised with great circumspection, and only in cases where
there is fraud or spoliation, or imminent danger of the loss of
the property if the immediate possession should not be taken
by the Court; and these facts must be clearly proved. But
when these conditions have been fully met, Courts do not hesi-
tate to appoint receivers over the property of corporations for
the benefit of all concerned during the controversy.

A bill was filed by certain stockholders of the U. Company against
said company, and the B. Company and others, asking for a
receiver for the former company on the ground that the B.

Davis, *et al. vs.* United States Electric Power & Light Co., *et al.*

Company had obtained control of its stock and had elected a board of directors, who at the instance, and for the benefit, of the B. Company had adopted a fraudulent policy, and were carrying it out by the fraudulent acts set out in the bill, and that if this policy were persisted in, ruin would soon overtake the U. Company, and its stockholders would suffer the loss of the value of their stock. HELD:

1st. That if these allegations were clearly proved the Court would be enabled to decide a gross fraud was being perpetrated, and it would have ample jurisdiction to take the affairs of said U. Company from the control of the directors, and place them in the hands of a receiver, to be administered under the direction of the Court according to the principles of law and equity, although there was no allegation that said company was insolvent, or that its property was being wasted.

2nd. That though there might be persons in the board of directors of the U. Company who were interested in the affairs of the B. Company, this circumstance alone, while it should subject their conduct to rigid scrutiny by the Court, did not afford ground of presumption against the legality and fairness of the dealings and transactions between the two companies; and to be successful in any attempt to impeach the validity of their acts, with a view to making them or the rival corporation responsible, there must be distinct charges of misconduct, fully supported by proof.

3rd. That the charges of fraud were not sustained by sufficient proof, and the plaintiffs were not entitled to the relief prayed.

APPEAL from the Circuit Court of Baltimore City.

This appeal was taken from a decree of the Court below, (DENNIS, J.,) dismissing the complainant's bill for a receiver. The case is stated in the opinion of this Court.

The cause was argued before ALVEY, C. J., ROBINSON, BRYAN, FOWLER, PAGE, and McSHERRY, J.

*Thomas Hughes,* (with whom was *William A. Fisher,* on the brief,) for the appellants.

Davis, *et al. vs.* United States Electric Power & Light Co., *et al.*

*Skipwith Wilmer*, and *Randolph Barton*, for the appellees.

PAGE, J., delivered the opinion of the Court.

The bill in this case was filed by certain stockholders of the United States Electric Power and Light Company of Baltimore City, on behalf of themselves, and of other stockholders of said company, in like situation with themselves. This company was incorporated under the general law of the State of Maryland, for the purpose of manufacturing electricity for illuminating purposes, and for use as a power, and for all other purposes to which electricity or magnetism may be applied, and also for buying and selling dynamo electric machines for the manufacture of electricity, and all other machines and inventions connected therewith throughout the State. For a number of years, it has been engaged in the business for which it was incorporated in the City of Baltimore, and, at the time of the institution of these proceedings, was furnishing light and power to about one hundred and seventy-five customers. Its capital stock consists of five thousand shares, of the par value of $100 each, of which one thousand are unissued, twenty-five hundred and five are owned by the Brush Electric Company of Baltimore City, one hundred and ninety-six by Augustus G. Davis, one of the complainants, and of the remaining shares various amounts are held by the other complainants.

The Brush Electric Company of Baltimore City was also incorporated under the laws of the State of Maryland, for the purpose of conducting the same business, and, prior to the year 1886, was a rival and a competitor of the United States Company in the City of Baltimore. To prevent the ruinous rate-cutting and underbidding, which were the consequences of this rivalry, the Brush Company, in that year, became the purchaser

of a majority of the stock of the United States Company. The affairs of the latter company seem to have been conducted to the satisfaction of both the companies, until November of 1891, when the alleged troubles began, which form the subjects of complaint. The bill alleges, that on that day an election was held by the stockholders of the United States Company, at which was chosen, a board of directors, a majority of whom were persons principally interested in the affairs of the Brush Company, appointed by that company to carry out a policy dictated by the Brush Company as follows, viz., First, to conduct the affairs of the United States Company "in the interest of, and in order to feed, the Brush Electric Company, at the expense of the stockholders, not interested in the said Brush Electric Company; second, to permit it to earn only an income sufficient to provide for its running expenses; and third, to close up the affairs of the United States Company, and dispense with its operations, whenever it shall be found to be to the interest of the Brush Company." Many acts, alleged to be in furtherance of this policy, are set out in the bill. As we shall consider these later on, they need not be more particularly referred to at this point. The complainants also charge, that, although the value of the shares of stock of the United States Company has been greatly lessened by these fraudulent doings, nevertheless their value has not yet been wholly destroyed, but will speedily be, unless control of the corporation be promptly withdrawn from those who constitute a majority of the board of directors; and that they are without remedy save by the "immediate appointment of a receiver, who can remove the conduct of affairs" of the company from the control of these directors, and conduct the same under the direction of the Court, until its affairs can be finally wound up; that its business can no longer be profitably conducted, and it is for the inte-

rest of the stockholders that it should be wound up, and its assets sold and disposed of according to the rights and equities of shareholders and creditors, and for that purpose pray that a receiver may be appointed.

The answer of the Brush Company which is adopted by all the other defendants, (except the two Safe Deposit Companies), denies the alleged policy of the directors of the United States Company, and affirms that, in so far as the officers and members of the Brush Company have taken part in the affairs of that company, "they have been governed not only by the desire to give value to this defendant's large interest in said company, but to deal fairly and honestly with all concerned." It either denies or explains the several acts attributed by the bill to the Brush Company, and denies all fraud, or that the value of the shares of the United States Company has been lessened by any act of the Brush Company, or of its officers and members, and demands full proof of all the allegations in the bill not specifically admitted.

There is no question raised as to the power of the Brush Company to purchase and hold the stock of the United States Company. Since the case of *Booth, et al. vs. Robinson, et al.,* 55 *Md.,* 433, it is settled in this State, that "one corporation may deal in the shares of another, without express authority so to do, unless where expressly prohibited, or the nature of its business renders it improper so to deal." But it was contended at the argument, that the Brush Company, occupying the relation which it does to the public, had no right to participate at all in the election of directors. But we think this contention cannot be maintained. If it be conceded that the company can lawfully purchase and hold the stock, then, in the absence of any restriction contained in the charter it must follow, as an incident to the ownership of the stock, as well as by the express terms of the statute, that it shall have a vote at all meet-

ings of stockholders for each share of stock it may hold. *Mottu, et al. vs. Primrose*, 23 *Md.*, 501.

In that case the Court not only lays down this rule, but proceeds: "While the minority of the stockholders are entitled to protection against the fraudulent or illegal action of the majority, that protection is not to be had by denying to the majority, their right annually to elect the Board of Managers."

The gravamen of the complaint made by the bill is, that the Brush Company, having obtained control of the management of the United States Company, is using its power to make that company subservient to its own interest, to use it as a feeder, and finally utterly to destroy it, whenever it shall be to their profit so to do. This, as was said in *Booth vs. Robinson*, (*supra*,) would be a fraud of the most flagrant character. It would subject the corporation at whose instance the scheme was devised and executed, not only to a civil liability for the injury done, but also to the penalties of misuser or abuser of its franchises; and in such a case "Courts can neither be too emphatic in condemning the act, nor too ready to afford the strongest remedy allowed by law for the prevention or redress of the wrong." In this case, the relief prayed for, must be granted, if at all, in the exercise of the ordinary powers of a Court of equity. The dissolution of the company is not asked for; as indeed it could not be, without a compliance with the provisions of the Code having reference to that subject. The principles applicable to the appointment of receivers have been definitely settled in Maryland. The power is a discretionary one, to be exercised with great circumspection, and only in cases where there is fraud or spoliation, or imminent danger of the loss of the property, if the immediate possession should not be taken by the Court; and these facts must be clearly proved. But where these conditions have been fully

met, Courts do not hesitate to appoint receivers over the property of corporations, for the benefit of all concerned during the controversy. *Clark, et al. vs. Ridgely, et al.*, 1 *Md. Ch. Dec.*, 70; *Blondheim, et al. vs. Moore*, 11 *Md.*, 374; *State vs. Northern Central Railway Co.*, 18 *Md.*, 215; *Voshell & Heaton vs. Hynson, et al.*, 26 *Md.*, 83.

It is not here alleged that the United States Company is at present insolvent, or that its property is being wasted, but that the directors, at the instance and for the benefit of the Brush Company, have adopted a fraudulent policy, and are carrying it out by the fraudulent acts set out in the bill, and that if this policy be persisted in, ruin will soon overtake that company, and its stockholders will suffer the loss of the value of their stock. If these allegations are clearly proved, the Court would be enabled to decide a gross fraud was being perpetrated, and it would have ample jurisdiction to take the affairs of the company from the control of the directors, and place them in the hands of a receiver, to be administered under the direction of the Court, according to the principles of law and equity. Before proceeding, however, to examine the evidence, it may be well, to advert to the fact that "upon the question of the fraudulent intent or design charged," though it be true that there may be persons in the board of directors of the United States Company, who are interested in the affairs of the Brush Company, this circumstance alone, "while it should subject their conduct to rigid scrutiny by the Court, does not afford ground of presumption against the legality and fairness of the dealings and transactions between the two companies." They were the chosen agents of the United States Company, and "to be successful in any attempt to impeach the validity of their acts," with a view to making them or the rival corporation responsible, "there must be distinct charges of misconduct, fully supported by proof." *Booth vs. Robinson*, (*supra*,) and authorities there cited.

Is the charge of fraud made by the bill sustained by the proof? It appears from the record, that, prior to 1886, the two electric companies were engaged in the business of furnishing light and power in the City of Baltimore. A strong rivalry between them sprang up, in which rate-cutting and under-bidding for business, were practised by both companies, to an extent that jeopardized the prosperity, if not the existence, of both of them. To put an end to this ruinous condition of affairs, and to secure harmonious relations with its rival, the Brush Company, on the 18th of June, 1886, purchased two thousand five hundred and five shares of the stock of the United States Company, being a majority of the entire number of shares then outstanding, at a cost, in the aggregate, of about $60,000. It is not claimed by the complainants that the purchase was in any respect tainted with fraud, either as to the manner in which it came about, or as to the purposes actuating any of the parties to the transaction. At the time of this purchase the affairs of the United States Company were in bad condition. Prompt action was needed to save it from ruinous disaster. Mr. Baldwin, referring to its condition at this period, states "it was most deplorable." "They were without money or credit."

Their indebtedness was nearly $30,000; and their building, (constructed on leased ground,) as well as their plant, (estimated to be worth about $85,000,) required large outlays for repairs, which in the judgment of competent persons sent to examine them, were absolutely necessary to save the property from ruin. The complainants admit, that until November, 1891, the affairs of the United States Company were successfully managed. The Brush Company, after its purchase of stock seems to have rendered to the United States Company most substantial aid. It became the surety for the United States Company for the sum needed for immediate

Davis, *et al. vs.* United States Electric Power & Light Co., *et al.*

expenditure, and two years later, when the latter company had failed to find a market for its bonds, the Brush Company accepted them in payment of sums due to itself, and prevailed upon the creditors to take them also for their claims, and by this means, $45,000, out of an entire issue of $60,000 were successfully placed. Thus relieved of its pressing necessities, and of disastrous rate-cutting, the United States Company became more prosperous. Its business and revenue steadily increased. No dividends were declared, but its net earnings were applied to betterments, until now it is free from debt, with a plant estimated to be worth $200,000, its stock enhanced in value from $24 to $50 per share, and, in the opinion of Mr. Clark, the President, enabled before very long to pay a three per cent. dividend on the capital stock of $500,000. In addition to this, the bonds of the company which were sold in 1886 at ninety cents in the dollar, now, in the opinion of Mr. Clark, the President, "ought to bring very close to par, if not par," and the business has become, and is a valuable and increasing one, if properly conducted. On November 21st, 1891, however, it is contended, came a change in the management. On that day was elected a new board of directors, of which a majority were selected by the Brush Company, for the purpose of putting in force a policy, which had for its object the aggrandizement of that company at the expense of the stockholders of the United States Company. It is attempted to establish this charge by the alleged declarations of the president and secretary of the Brush Company, set out in the twelfth paragraph of the bill, and by necessary deductions from the several acts charged in the seventh to the eleventh paragraph inclusive.

As to the first the allegation is that the president and secretary of the Brush Company have declared that "it is the purpose of the Brush Electric Company ultimately to close out and wind up the United States

Electric Power and Light Company, and, as one step to the accomplishment thereof, they have declared their purpose and intention of having removed during the present spring a large portion of the poles thereof." The only proof on this subject, is from Mr. Keilholtz, secretary of the United States Company, to the effect that he heard Mr. Tudor, secretary of the Brush Company, state repeatedly that it was the purpose of that company to take whatever was valuable from the United States Company; and also from Mr. Clark, who states that he heard "Mr. Baldwin, Mr. Tudor and Mr. Whitridge remark it was their purpose to get all they can from the United States Company." These three gentlemen thus referred to, however, flatly deny having used language capable of being so construed or understood. On the contrary, each, in varying phraseology, affirms, it was the policy of the Brush Company to keep the interest of the two companies distinct; each company attending to its own business; to give contracts to the company who could execute it with the least expense; and to do nothing to interfere with the United States or to check its prosperity.

Second. It would prolong this opinion too much to enter into a minute analysis of the proof touching each of the several charges set out in paragraphs of the bill numbered from seven to eleven inclusive. We can only state briefly the conclusions we have reached, after a careful examination of all the evidence in the case. The seventh section charges that the directors, for the purpose of carrying out their fraudulent policy, have violated the by-laws of the company in appointing from their members a committee, called in the bill the "Executive Board," to attend to the executive business of the company. But nothing in the evidence shows us what the duties of that committee were. They were not specified or defined, says Mr. Keilholtz. The president of the Brush Company, however, said to Mr. Clark, its purpose was to

"decide difficult matters." Under the fourth section of the by-laws the duties of the president were to preside at meetings, call special meetings, be a member of all committees and attend generally to the executive business of the Company, *under the direction of the board."* We find nothing in the proof to show that any duty imposed on this committee by the company, or any act of theirs, was in violation of these provisions. Nor do we find in its creation, any evidence of a fraudulent purpose on the part of the directors, whether that fact be considered by itself, or in connection with the other facts in the case. It seems, however, that, after the November election, applications for service were required to be referred to Mr. Tudor for determination, and complaint is made, in the eighth paragraph of the bill, that this was another step in the alleged fraudulent policy, and that in more than twenty-five cases the secretary was directed to decline the application, and refer the applicant to the Brush Company to the great detriment of the United States Company.

It is not clear by whom this requirement was made. Mr. Baker was at one time, the general manager of both companies, and during the period of his incumbency, it was he who decided upon all applications. Owing to some difficulty with his employés, he retired from the management of the United States Company and then the applications were referred to Mr. Tudor. Mr. Keilholtz testifies, it was in obedience to Mr. Tudor's orders, "as he (Mr. Tudor) stated that the executive committee had referred that matter to him," but Mr. Clark, the president of the United States Company, states that there was some understanding with the Brush Company, that Mr. Tudor was to decide what lights to take; and further on, the same witness states, that the references were so made, "by the order from Mr. Baldwin, I believe, and Mr. Whitridge."

But no matter how this may be, we do not think under the circumstances of the case, even if these applications were referred to Mr. Tudor by direction of the executive board, it would indicate the presence of a fraudulent purpose toward the United States Company. It is clear, owing to the peculiar nature of the physical structure required to furnish electric light and power, that unless each company was equipped to supply all parts of the city, at the same cost, it might well happen, that one company would be able to do a particular service at less cost than the other. In order to economize for both companies, the facts show, that the policy was adopted of giving the application to the company, that could execute it at least expense. Mr. Tudor says, "we were always governed by that general rule; which was the most economical and which cost the least outlay for either company, more particularly the United States Company." After a careful examination of all the evidence on this point, we think the facts as detailed therein bear out this statement.

The weight of the testimony is to the effect, that the secretary of the United States Company was directed to furnish with his reference of applications to Mr. Tudor, a statement showing the proximity of that company's poles, and that in deciding which company should take the contract a reasonable fairness was observed. We do not undertake to pass upon the correctness of Mr. Tudor's decision, in each of the cases mentioned in the testimony, so referred to him by the secretary of the United States Company; it is sufficient for this case to say, that we find nothing that would justify a Court in pronouncing that he was influenced in his decision by such motives as were discreditable to himself, or detrimental to the interest of the stockholders of the United States Company.

Great stress was laid upon the circumstances attending the transactions by which the contract for furnish-

ing the North Avenue Railway Company with power, necessary to run their cars, was transferred from the United States Company to the Brush Company.    The facts briefly stated are these :

In 1890 the Brush Company had contracted with the Railway Company to operate their cars, but after serving them some time, the Railway Company became dissatisfied, removed their generator from the station of the Brush Company, and furnished their power themselves from a house on their own land.    This plan was afterward abandoned, and the generator was put at the Wenstrom works.    Sometime after, the Wenstrom Company became financially embarrassed, and then the United States Company took the contract.    For about a month affairs went along smoothly, when, as he himself, testifies, Mr. Keilholtz noticed an application filed by the Railway Company to locate a power house.    He went immediately to Mr. Whitridge, the President of the Railway Company, conferred with him about the matter, and after consultation with Mr. Clark, notified him *"to get out of the station."*    (Meaning by that phrase, that his company would break the contract).    Accordingly on the 19*th of September*, 1891, a letter was addressed to Mr. Whitridge by Mr. Keilholtz, "Secretary," in which he uses these words:    "I beg to *confirm* the conversation held with you this day, relating to the termination of the contract between us.    You will therefore consider this sufficient notice, that, *ninety days after date*, the contract, under date of August 5th, 1891, will have been terminated."    The President of the Railway Company immediately went to see Dr. Whitridge, and asked him whether the Brush Company could give them the power. Dr. Whitridge replied that he thought they could, and thereupon the President of the Railway Company sent a letter to the Brush Company, asking them to furnish it. Mr. Baldwin testifies that, upon receipt of that letter,

he, with his secretary, "went on attending to it, just as he attended to an application from any other source for any other business." From this statement it clearly appears that neither the Brush Company nor any of its officers had anything to do with the termination of the contract, and that it was lost by a policy which was adopted by the officers of the United States Company, inaugurated for the benefit of that company, and for which Mr. Clark and Mr. Keilholtz appear to be solely responsible. Thus having obtained the contract, the Brush Company entered into a contract with the United States Company, under which the latter company secured the generators of the Railway Company and furnished the power required at sixty-six per cent. of the price received by the Brush Company, and one-third less than it received under the former contract. We are not called upon to approve this arrangement, and, though we may not, we are not able to regard it as sustaining the charge that the Brush Company were actuated in making it by a fraudulent design of bringing disaster upon the affairs of the United States Company. The proof leaves it somewhat in doubt as to whether that company incurred loss in supplying the power under the new contract; the weight of evidence, in our opinion, being that it did not. But it is shown that no complaint was ever made to the Brush Company or to any one, that such was the fact.

The tenth paragraph of the bill charges that a proposition was made by the General Agent of the Northern Central Railway Company, for a service of sixty lights at Canton, the response to which Mr. Wilkins, the agent, said would place the United States Company, as to figures in competition with the Brush Company, to which he had made similar applications ; that this application was referred to the secretary of the Brush Company, who directed the secretary of the United States

Davis, *et al. vs.* United States Electric Power & Light Co., *et al.*

Company to decline to submit a proposition, whereby the United States Company were prevented from competing for the contract—"with a strong promise of success of getting it, and it could have filled the contract if gotten, successfully, and with large profit." The reply sent by the secretary of the United States Company in conformity with Mr. Tudor's directions, was that "the United States Company regret very much our inability to make you a proposal for serving them. Our lines are *very far from the locality named,* and our company is not prepared at present to make the necessary extension." It is not insisted that the facts stated in this letter were false.

Mr. Tudor himself, on this point, testifies, and there is no evidence contradicting his statement: "Mr. Keilholtz consulted me about it, and as it would require a very great outlay on their (the United States Company's) part, to reach that point, *and as our lines* go very nearly there, it was deemed best to instruct them to write to Mr. Wilkins, stating that they would have to decline making a proposal—as it could not be done except at very heavy expense."

In so instructing him, it seems the policy of giving the contract to the company that could fill it with least expense was being adhered to, and we find no fraudulent motive in the transaction. It may be added that neither company has been awarded the contract.

Nor do we find anything questionable in the circumstances attending the loan of two thousand dollars by the United States Company to the Brush Company.

It has already been partially repaid, and the balance due is, at any time, subject to the call of the United States Company.

We have thus gone over in detail all the allegations of the complainant's bill, and not finding them to be sustained by such clear proof as is required to justify

the Court in granting the prayer of the bill, we must affirm the decree.

*Decree affirmed, with costs.*