# THOMAS J. CANNON *vs*. THE BRUSH ELECTRIC CO. ET AL.

*Rights and Liabilities of Members of an Association Not Legally Incorporated but Supposed so to be—Control of One Corporation or Association by Another—Charges of Fraud and Mismanagement of an Association by a Corporation Owning Controlling Interest Held Not to be Established.*

When parties attempt to form a corporation with shares of stock but it has no legal existence as a corporation, then the rights and liabilities of such parties among themselves are not those of partners, because they did not intend to be partners, but their rights should be determined according to the conditions and limitations applicable to the kind of corporation they supposed that they had formed.

When one corporation acquires a controlling interest in the shares of another, electing the directors of the latter company, and a shareholder in the company so controlled files a bill in equity alleging that the business and interests of that company were unfairly and fraudulently subordinated to the interests of the controlling company, the latter company and the directors representing it are answerable for fraud or such gross negligence in the management of the business as amounts to fraud, and the burden of proving such mismanagement is upon the plaintiff.

The relation of a corporation which controls the management of another company to the latter is not that of an agent to his principal.

When a duly incorporated corporation acquires a majority of the shares of stock in a company which was not legally incorporated but the rights of whose members *inter sese* are to be governed by the terms of the supposed charter, then the relations between the controlling corporation and the members of the voluntary association are to be governed by the law which regulates the dealing of one corporation with another. The controlling corporation is not the agent of the members of the association, nor are they all partners among themselves.

The U. S. Electric Co. was really a voluntary association since its supposed charter was invalid. The defendant, the Brush Elec. Co., acquired nearly three-fourths of the shares of stock of the U. S. Co., elected the directors of the latter, the majority of them being directors of the Brush Co., and controlled the management of the U. S. Co. Plaintiff, a member and holder of shares in the U. S. Co., filed the bill in this case alleging that the defendant company was seeking to take for itself the business of the U. S. Co. and destroy the latter as a competitor, and various acts of mismanagement by which the defendant

company was unfairly benefited at the expense of the U. S. Co. were alleged. The prayer of the bill was for a receiver for the U. S. Co. and an accounting for the property and profits of that association taken by the defendant. *Held* upon the facts, that the evidence does not show that the defendant company had acted in bad faith in the different matters charged or that it had been guilty of gross negligence in the management of the business of the U. S. Co.

Appeal from an order of Circuit Court No. 2, of Baltimore City (DENNIS, J.)

### REPORT OF AUDITOR.

The bill of complaint alleges among other things that the complainant and defendants are co-partners, as the attempted incorporation of the consolidated company, the United States Electric Power and Light Company, is void.

The Court by decree of November 26th, 1897, has decided that the said United States Electric Power and Light Company was not duly incorporated and did not acquire and possess the powers and rights of a legally incorporated company under the laws of Maryland. The auditor does not understand, however, that the Court has as yet considered and determined whether or not the parties interested in the said company, are as *inter sese* co-partners, or what is their legal *status*, as regards each other. The facts are:

On October 8th, 1881, the United States Electric Light Company attempted to incorporate under the general law, and on September 5th, 1885, the United States Electric Lighting Company made a similar attempt, and on October 21st, 1885, the present company, the United States Electric Power and Light Company, was attempted to be formed by a consolidation of the two former companies.

By the terms of the pretended articles of consolidation the present company was to have a capital stock of five thousand shares of one hundred dollars each, and its board of directors was to consist of nine of its shareholders. Under these attempted incorporations the United States Electric Power and Light Company erected works and proceeded to furnish light and electric power in Baltimore City. On March 7th, 1882,

The Brush Electric Company made a similar attempt to incorporate under the general law, and in 1890 applied to the Legislature to validate its attempted incorporation, which the Legislature did March 30th, 1890, ch. 233.

In 1886, the Brush Company purchased from certain stockholders 2784 shares of the United States Electric Power and Light Company, and thus obtained a controlling interest in the United States Company.

Under this state of facts, the question arises, what was the relation thus created between the Brush Company and those interested in the United States Electric Power and Light Company.

As to third parties, who had dealings with, or became creditors of the United States Company, there can be no doubt that the relation would be that of *quasi* co-partners. 1 *Lindley on Part.*, 25. But as between themselves, the conditions seem to lack many of the elements which go to create the relation of co-partners. *Thompson on Corporations*, vol. 1, sec. 14, states as follows the difference between a corporation and a partnership is: "1st. Its members may in general, without restraint, by transferring their shares, introduce other persons in their stead," &c. "2nd. The members of a partnership are agents of the partnership firm, whereas in a corporation they only act through the agency of a board of directors," &c. "3rd. The partners are liable in their private estates, for debts," &c. And furthermore as between the parties themselves the mere fact of sharing in the profits will not create a partnership between the parties themselves, as to the property, contrary to their intention. *Berthold* v. *Goldsmith*, 24 How. 537. And again, between the parties themselves the test has always been their actual intent. *Culley* v. *Edwards*, 44 Ark. 424; *Waring et al.* v. *Nat. Marine Bank*, 74 Md. 278.

That there was no intention or understanding upon the Brush Company, or those representing it, when it bought into the United States Company, to become partners with their other co-shareholders in the latter company, is clear from the evidence, nor is there a particle of evidence to show that any-

one connected with either company, supposed or intended at the time of said purchase of stock by the Brush Company that a co-partnership was thereby formed as between themselves. But all parties up to the filing of the present bill, treated the United States Company as a duly incorporated company, the shares of which were sold, dealt in and transferred without the consent or prohibition of the other shareholders. The affairs of the concern were governed by a board of directors, elected by the shareholders according to the number of shares held.

In view of the fact that the incorporation of the United States Company has been found to have been void, and that there was no intention of the parties to become co-partners as between themselves, it appears to the auditor that the shareholders in this unincorporated company should be treated as members of a voluntary association who have by their acts agreed to conduct its affairs as between themselves, as a corporation, the interests in which are represented by shares of stock, and the management of which has by them been confided to the board of nine directors, and that the written terms upon which they have agreed to conduct the association are to be found in the pretended charter and the by-laws of the association.

If the auditor is right in this view of the case, then as between the controlling shareholder, the Brush Company, a duly incorporated company, and the shareholders of the United States Company who as above stated had conducted the United States Company as a corporation, it would appear that the principles of law which govern the dealings of one corporation with that of another corporation are the proper principles to apply to this case.

That bill of complaint after alleging, as above stated, that the parties are to be considered *inter sese* as partners, goes on to charge that the Brush Company in buying a controlling number of shares in the United States Company, did so "with the intent and for the purpose of securing to itself the control of said United States Company and of its property and business and of withdrawing it from competition with said Brush

Company," &c., and that the Brush Company elected a board of directors, a majority of whom were representatives of said Brush Company, and that said Brush Company has for several years past conducted the business of said United States Company for its own advantage, without regard to the benefit or advantage of the United States Company, and has excluded the members of the United States Company from participation in the management or control of said business and from sharing in any benefit therefrom, and that the Brush Company is seeking to destroy the United Company and take its business for said Brush Company.

That it took from the United States Company the business of the Northern Central Railway Company and that in consequence of this the United States Company is now running at a loss, and that it has taken other lighting contracts from said United States Company. And it has caused certain of the poles and lines of said United States Company to be taken down, and it has borrowed large sums of money from the United States Company. That when the central station of the Brush Company was destroyed by fire (October 13th, 1893), it required the United States Company to furnish the Brush Company's customers with electric current and paid the United States Company for it at rates wholly inadequate for the service, and forced the machinery of the United States Company beyond its power capacity and thereby greatly injured the same, and thus caused its service to be inferior and unsatisfactory, and created dissatisfaction among its customers, resulting in loss of business and revenue.

The bill then prays for an accounting by the Brush Company of all business, income, services and profits taken as aforesaid, and for a dissolution and winding up of the alleged co-partnership and the appointment of a receiver.

Such being the allegations of the bill, this case would seem to be similar to that of *Booth et al.* v. *Robinson et al.*, 55 Md. 419, with this exception that the company, the Powhatan Steamboat Company, which it is alleged was wrecked by mismanagement of the directors of another company, was a duly

incorporated company, whereas in the present case, the United States Company was an unincorporated company or associatian. But which, as between its members, was carried on and conducted on the same principles and under the same form of management as a corporation. In fact the whole foundation of the allegations is that under the form of management established by the shareholders of the United States Company, the Brush Company was enabled, through owning the greatest interest in the United States Company, to elect a majority of the managing agents of that company, which was designated as a board of directors, and that as such agents they mismanaged its affairs.

In *Booth* v. *Robinson*, 55 Md. 437, the Court (JUDGE ALVEY) in referring to the case of the *Charitable Corporation* v. *Sutton*, 2 Atk. 400, says, " In that case, LORD HARDWICKE, in defining the degree of care and fidelity required of a director, and for what nature of default he may liable, referred to the doctrine of the civil law upon the subject. By that law it is declared that those who are named by companies and corporations to have the direction of their affairs, are obliged to the same care and diligence as factors or agents. And they are answerable not only for any fraud and gross negligence which they may be guilty of but also for all faults that are contrary to the care required of them. 1 *Domat*, 2 b, til. 3, sec. 2, Art. 1. And in that case of Sutton, the Lord Chancellor held that directors of a corporation are liable in equity to the corporation not only for gross frauds and breaches of trust, whereby the assets of the corporation are wasted, but are also liable to the corporation, if the assets of the corporation have been wasted by negligence on their part, so gross as to amount to a breach of trust. This is the leading case upon the subject, and in which the law is as strongly laid down as in any subsequent case." And on page 438, the Court continuing says, " In the case of *Overend, Gurney & Co.* v. *Gurney*, L. R. 4 Ch. 701, and the same case on appeal, reported as *Overend, Gurney & Co.* v. *Gibb*, L. R. 5 H. L. 480, where the question was most elaborately discussed in respect to the neg-

ligence of directors, it was held that facts which may show imprudence in the exercise of powers clearly conferred upon the directors will not subject them to personal responsibility; but if the imprudence be so great and manifest as to amount to *crassa negligentia* and consequently a breach of trust, personal responsibility will be incurred. Indeed all cases agree that directors are not liable for the consequences of unwise or indiscreet management if their conduct is entirely due to mere default or mistakes of judgment. And the *onus* of proof of fraud, combination, or gross negligence, to render the directors personally liable, is upon the party making the charge; and the proof must be clear and manifest. *Turquand* v. *Marshall*, L. R., 4 Ch. 375; *Overend, Gurney & Co.* v. *Gibb*, L. R. 5 H. L. 480; *Hodges* v. *New England Screw Co.*, 1 R. I. 312.

Although the Court as above stated was discussing that phase of the case which charged the directors, Robinson and Shoemaker, with a personal liability, it also applied these principles, in reviewing these facts to the liability of the defendant company, the Steam Packet Company, represented by said Robinson and Shoemaker.

And continuing, the Court on page 439 says : "In this case the fact that Robinson and Shoemaker were stockholders and directors in the Steam Packet Company, as well as in the Powhatan Company, and participated in the transactions between the two companies, with certain interests in other companies, supposed to be interested, would seem to constitute the main foundation for the principal charges of the bill. And if it be true, as charged by the plaintiffs that the two defendants, Robinson and Shoemaker, acting for and in behalf of the Steam Packet Company, did purchase the stock in the Powhatan Company, and procured themselves to be elected directors therein, for the purpose of getting control of the management of that corporation, and by that means to make it subservient to the interest of rival companies, or with the design of making insolvent and utterly breaking down the corporation altogether, and thus getting rid of competition, no more flagrant fraud could be perpetrated; and there can be no

question but that for all loss to the company or its stockholders, resulting from the carrying out of such device or contrivance, the guilty parties should be held responsible to the fullest extent allowed by the law.   Not only would there be incurred a personal responsibility by the directors or agents participating in the wrong, but, if such a scheme were devised and executed at the instance or on behalf of another corporation, deriving its powers and franchises from the State, such conduct would be a fraud upon the State ; and in addition to incurring civil liability for the injury done such conduct would subject the offending corporation to the penalty of misurer or abuser of its franchises.   A corporation cannot be allowed to do indirectly and covertly what it is not authorized to do directly and openly."

"Such is the law as applicable to the case as stated in the bill.   But, if upon the proof, there is, a failure to establish the fraudulent design or purpose alleged to have characterized the various acts and transactions, done and instigated by the two directors named, the whole foundation fails.   For we have seen, mere indiscretion, want of skill or foresight or mistake of judgment in the conduct of the affairs of the corporation, afford no ground of personal liability on the part of the directors."

"And upon the question of the fraudulent intent or design charged, though it be true that these two directors represented both corporations—in the one, being two of a board of eight directors, and in the other two of a board of six directors— this fact alone, while it should subject their conduct to rigid scrutiny by the Court, does not afford ground of presumption against the legality and the fairness of the dealings and transactions between the two companies.   The two companies were certainly competent to contract the one with the other, and the two directors whose conduct is in question were interested in both companies, and by their relation to and official positions in them, they owed duties and were bound to be faithful alike to both.   Therefore, while acting within the scope of the powers delegated to them by the stockholders of the corpora-

tion, there is no presumption of illegality or unfairness in their dealings and transactions between the two companies. They were the chosen agents of both, and to be successful in any attempt to impeach the validity of their acts, with a view of making them personally responsible either to the corporation or to the stockholders there must be distinct charges of misconduct fully supported by proof. *Adams Mining Co.* v. *Senter*, 26 Mich. 73; *U. S. Rolling Co.* v. *Atlantic & Great Western R. Co.*, 34 Ohio St. 450."

"This case is altogether unlike that of a trustee, agent or director bargaining in a matter of personal advantage to himself individually, with the party reposing the confidence in him, and where it is incumbent upon him to show that a fair and reasonble use has been made of that confidence ; as in the cases of the *Hoffman Steam Coal Co.* v. *Cumbld. Coal & Iron Co.* 16 Md. 456; *Cumbld. Coal & Iron Co.* v. *Parish*, 42 Md. 598; *Jackson* v. *Ludeling*, 21 Wall. 616."

The auditor has quoted thus fully from the above case, because not only the principles of law laid down appear applicable to the present case but also because the conclusion the Court came to on a very similar state of facts in that case are the same that the auditor feels compelled to arrive at in this case.

In the account which the complainant has submitted to the auditor, as embodying his claim, the items are substantially as follows :

1st.  For business conducted from Oct. 1st,
  1893, to Dec. 1st, 1894 . . . . . . $254,262 66
  Interest Dec. 1, '94, to Nov. 1, 1901. . . 104,247 65  $358,510 31

  (This claim covers the period immediately
    succeeding the fire at the Brush Works
    and is a claim for the use of part of the
    U. S. Works during that period, but for
    which use the Brush Company has paid
    the sum of. . . . . . . . . . . .  13,233 55
  Interest on which from Dec. 31, '94, to
    Nov. 1, 1901, was . . . . . . . . .  5,425 75   18,650 30

          Amount forward. . . . . . . .        $339,851 01
          Amount forwarded . . . . . . .        $339,851 01
2nd.  For money collected from North
    Avenue Railway, &c., from
    Jan. 1st, 1892, to June 30, '93.  8,969 08
  Interest June 30, 1893, to Nov.
    1, 1901 . . . . . . . . . .  4,484 54   13,453 62

| | | | |
|---|---|---:|---:|
| Less amount paid to U. S. Company. . . . . . . . . . | | 6,448 75 | |
| Interest June 30, '93, to Nov. 1, 1901 . . . . . . . . | 3,224 37 | 9,673 12 | 3,780 50 |

3rd. Gross profit on amount admitted by Brush Company to have been realized from the business of the Northern Central Railway Company, taken by the Brush Company from United States Company . . . . . . . . . . .   1,532 73

Interest July 20, '96, to Nov. 1, '01 . . .   486 64     2,019 37

4th. Gross profits on business admitted by the Brush Company to have been done by it on Pennsylvania avenue and Patterson avenue, 1896 . . . . . . . . .   138 64

Interest July 20, '96, to Nov. 1, '01 . . .   44 02     182 66

5th. Gross profits on earnings admitted by Brush Company to have been made by it from sundry customers of United States Co. . . . . . . . . . . .   2,463 58

Interest July 20, '96, to Nov. 1, '01 . . .   782 23     3,245 81

$349,079 35

Much of the testimony supposed to support the claim for the items 2nd and 5th is found in the case of *Davis et al.* v. *United States Electric Power and Light Company et al.*, and where these very questions here raised have been thoroughly thrashed over by the Court in its opinion, 77 Md. 35.

For while there is a nominal change of parties, the complainant Davis, in the one case, having by a trade of United States Company stock for Viaduct Manufacturing Company stock, transferred his stock to the present complainant Cannon and thus although the matters may not strictly be considered *res adjudicata*, yet the facts being the same, although the parties are nominally different the decision must be the same in this case as in the *Davis case* except as to such new matter as may have been introduced since then.

Item 2nd. The matter of the transfer of the contract for serving power to North Avenue Railroad from United States Company to Brush Company is fully considered by the Court in *Davis* v. *United States Company*, and the conclusion arrived at that the contract was "lost by a policy which was adopted by the officers of the United States Company, inaugurated for

the benefit of that company," and exonerating the Brush Company from any fraudulent attempt to injure the United States Company by making an independent contract with the North Avenue Company for service.   The present claim, by simply extending the period of time for which the claim is made, seeks to open that question anew.   If, however, as decided in *Davis* v. *United States Company*, the Brush Company had a perfect right to make the contract with the North Avenue Company, it is difficult to see how any claim can be set up against that right now.   The contract however subsequently entered into between the Brush Company and the United States Company whereby the United States Company was to furnish the current and receive in payment 66 per cent of the amount received by the Brush Company from the railroad may in this case, which is a bill for an accounting, be a matter of inquiry.   This contract and the rate of 66 per cent appears to have been agreed upon after a consultation between the officers of two companies, at a meeting of the executive committee of the United States Company at which Mr. Baldwin and Dr. Whitridge appeared to act on behalf of the Brush Company, and Mr. Clark who presided and Mr. Keilholtz who was present but not a member of the board appeared to advocate the interest of the United States Company, Mr. Keilholtz relates what occurred, *Davis case* testimony, p. 46, as follows : "A general discussion as to the cost of operating the North Avenue Railway Company's generators at the station was entered into for the purpose of determining the proper proportion of the receipts from the said railway company that are due the United States Electric Power and Light Company for operating these generators for the Brush Electric Company."

Dr. Whitridge offered the following resolution which was seconded by Mr. Baldwin : "That the United States Electric Power and Light Company agree to operate the railway generators for two-thirds of the total amount charged the North Avenue Railway Company on account of this service, which proposition will be acceptable to the Brush Company.   Mr.

Clark objected on the ground that the United States Electric Power and Light Company would not receive sufficient compensation for the service rendered.   The vote was as follows : ayes, Whitridge and Baldwin, nay, Clark, and the motion was carried."   Mr. Keilholtz stated to Mr. Clark that he, Keilholtz, thought a ten per cent collection would be a proper charge to pay the Brush Company, Q. 123, p. 47, *Davis case.*   See also *Clark's testimony*, 31 Q., p. 101, *Davis case.*

The contention on the part of the complainant is that as the above resolution was carried by the majority of the committee representing the Brush interest, the presumption is that it was unjust to the United States Company.   The Court, however, in speaking of this transaction, says : (*Davis* v. *United States Electric Power and Light Co.*, 77 Md. 48.)   " The proof leaves it somewhat in doubt as to whether that company " (United States Company) " incurred loss in supplying the power under the new contract ; the weight of the evidence, in our opinion, being that it did not.   But it is shown that no complaint was ever made to the Brush Company or to any one, that such was the fact."   The United States Company continued to operate under these terms and to receive the 66 per cent of money paid, and the auditor therefore does not see any reason, which would authorize him in reforming this contract.

The 5th item, being for money received from various customers of the United States Company taken from it by the Brush Company.   This claim appears to be the same discussed by the Court in the *Davis case*, pp. 45–46 of 77 Md., in reference to the order that all applications for lights should be referred to Mr. Tudor, secretary of the Brush, as they had formerly been referred to Mr. Baker, general manager of both the Brush and the United States Company, and the charge is that Mr. Tudor refused to allow the United States Company to have such lights as justly belonged to it.   The Court says on p. 46, " We do not undertake to pass upon the correctness of Mr. Tudor's decision, in each of the cases mentioned in the testimony, so referred to him by the secretary of the United States Company ; it is sufficient for this case to say that we

find nothing that would justify a Court in pronouncing that he was influenced in his decision by such motives as were discreditable to himself, or detrimental to the interest of the stockholders of the United States Company," and the auditor has found nothing in the evidence taken since the *Davis case,* to show any fraudulent interest or injustice in the dealing on this behalf between the two concerns.

### The First Item of the Account.

Going back now to those items in the account asked for by the complaint, and which are based upon the occurrences and the facts involved in the *Davis case.*

The first item asks an allowance of principal with interest, less credits, of $358,510.31, being proceeds of the business conducted from October 1893 to November 1894. This claim is based upon the following facts :

On October 13th, 1893, the Brush Company's works were practically destroyed by fire, and the Brush Company sought by whatever means practicable to immediately furnish lights to its customers, many of which lights were of extreme necessity, such as the arc lights furnished to light the city. Some of these lights were in the emergency, given to the Maryland Electric Company to furnish current over the Brush wires and poles, for which the Brush got no compensation, but the Maryland Company collected direct from the city for the service, and power was gotten to run a 60 light brush machine from McElderry's wharf, but what compensation was paid for this power does not appear. The main power for some time after the fire came from power furnished by the boilers and engines of United States Company, to Brush electric machines installed by the Brush Company in United States Company's works, and the charge is :

That immediately after the fire the Brush sent word to the United States Company not to take any more lights until they heard further from them, and that the Brush Company proceeded to install its electrical machines in the United States Company's works and put blowers on the boilers and thus stimulated them beyond their normal capacity to the great in-

jury of them and their engines, and thus served the Brush Company's customers. It was subsequently arranged some time in the spring of 1894, following, that the Brush Company would pay for this power at the rate of $1,500 per month. This amount it is charged was grossly inadequate, and that as the Brush Company's earnings were almost entirely realized after the fire, from currents generated at the United States Company's works, that its whole gross income from October 1893 to November 1894, belongs to the United States Company, less what has been paid them, some 13,000 odd dollars. Upon the theory that the burden of proof is on the Brush Company to show what part of its earnings came from the power furnished from United State's Company's works and what from other sources if any, and failing in so doing the largest sum is to be charged against them. That furthermore at the time of the fire there was claimed as due the United States Company $30,000, $15,000 of which was loaned to the Brush Company and that it was the duty of the Brush Company, immediately after the fire, instead of putting its electrical machines in the United States Company's works to have purchased with this money electric machines for the United States Company.

First as to the charge that the United States Company was ordered by the Brush management to take no more lights until they heard further from them. It would appear from the complainants own witnesses that the United States Company had but little capacity to furnish many more lights than it was furnishing at the time of the fire. Carmady testifies, page 46, Examiner's testimony, that the capacity of the United States machines, including two 20-light machines which could be run on either arc or incandescent lights, but were in the fall of 1893 run on incandescent lights, was about 400 arc lights. (Ans. 12, 13 and 14 Q., page 46 Examiner's testimony), and that in October, 1893, they furnished 344 Saturday night lights, 16 Q.

It would thus appear, that on Saturday nights, at least, the works were furnishing to its customers lights, if not fully,

nearly up to its capacity, viz : 344 arc lights and two 20-light machines which were running on incandescent lights, which would make "about 400" arc lights, the full capacity of the works.

Further, the complainant's witness, Georgia C. Bowen, clerk and book-keeper of United States Company, testifies : "The day after the fire, there were a good many calls for lights, which we did not as a general thing supply, but in some cases we did. For two reasons, one was we had an order from the Brush Company not to do anything in the matter of taking lights until we heard further from them, and the other was, it was the fall of the year, and we were full of lights, and I don't think we had much room to take any. The company was of small capacity." (7, 8, 9 and 10 Q., page 83, Examiner's testimony.)

As to the whole of the service, being rendered by the United States Company's station, from October 1893 to November 1894, or for any great part of that time, whereby alone the Brush Company was able to furnish current from which it received any revenue. As stated above, it was testified to that it installed a 60-light machine at McElderry's Wharf. The defendant's witness, Slemons, testifies that he was employed at the Brush works prior to and after the fire, and that inside of three weeks after the fire the Brush Company at its own works had two engines going, capable of and driving five hundred horse-power ; that there were added and going, before the end of the year, one engine capable of driving four Brush machines, of 60 lights' capacity, which would be about 240 horse-power, and one engine of an incandescent machine of 124 horse-power. (Auditor's additional testimony, pages 2 and 3.)

The complainant's witness, Tenley, states that it was between five and six weeks after the fire before the Brush works furnished any current. (Auditor's additional testimony, page 8.)

It further appears from the testimony that from time to time in 1894, the electric machines placed in the United States

Company's works by the Brush Company after the fire were removed and installed in the Brush works, at just what dates these machines were taken out of the United States Company's works does not appear. But the question is what was a reasonable compensation to be paid the United States Company for the power furnished to run the Brush Company's machines, so that the Brush Company could serve its customers over its own wires, and whether the rate of $1,500 per month paid by the Brush Company for this power was a reasonable one. The manner in which this proposition to pay $1,500 a month was viewed by those representing the minority and adverse interest in the United States Company furnishes the best evidence of its reasonableness. The complainant, Cannon, testified that he was present at the meeting when this proposition was made, and that he asked if they could not make it $1,550 a month. (Examiner's testimony, Ans. 13, page 3.) That Mr. Clark thought the allowance entirely too low, (Ans. 18) "And as he thought so, I thought so too, and I made the proposition to try and get $50 more and failed." (Ans. 20 Q.) It would thus appear that the complainant himself only asked for a slight increase over the price named and paid.

There is a further claim that it was the duty of the Brush Company, representing as it did the controlling interest in the United States Company immediately after the fire, to have purchased, with whatever amount of money was to the credit of the United States Company, machinery and installed it in United States Company, so that the United States Company could have served the Brush Company's customers who applied to it immediately after the fire. It is somewhat uncertain just how much money there was to the credit of the Brush Company at that time, whether thirty thousand or twelve thousand, but it is alleged, see Plaintiff's Exhibit, Examiner No. 1, (newspaper article), that it was thirty thousand dollars and that fifteen thousand dollars was loaned to the Brush Company, some, but how much is not stated, on notes which had been redeemed from time to time, and some on call of

long standing.   As to the remaining fifteen thousand, Cannon states, that at the time of the meeting to which the said newspaper article refers, a question came up in reference to the ground rent on the United States Company's works then coming due and could be redeemed out of the funds of the company.   (Examiner's testimony, page 5, Ans. 28).   It appears that this ground rent was so redeemed, and the question is was the fact that the Brush Company did not take the money used in redeeming this ground rent, and return whatever amount it held on call, and pay the notes given to the United States Company ; and install machinery in the United States Company's works so that the United States Company could reap the full benefit of the Brush misfortune ?   As stated in the opinion in *Booth* v. *Robinson,* 55 Md., the common directors had duties to both companies which they must observe and to sacrifice the interest of either company to the other would have been a breach of the trust reposed in them.   It could not be supposed even if they had purchased at a large expense additional machinery for the United States Company that the common directors would have been justified in allowing the United States Company to have offered more than a temporary service to the Brush Company's customers, and that when the Brush Company was able to resume business, the United States Company would not have been left with the machinery on its hands.   It does not appear that the arrangement made with the Maryland Company, which the Brush found fully equipped to come to their assistance, was anything but a temporary arrangement, or that the Brush Company did not as soon as it was able, resume furnishing lights to the city.

The auditor, therefore, does not find that the Brush Company as represented by its directors, was guilty of that *crassa negligentia* which would make it liable, in not using the funds on hand, at the time of the fire, to install new and additional machinery in the United States Company's works, but rather that the weight of the evidence is that it acted wisely for the United States Company in not doing so under the circumstances.

*Third Item of the Account.*

"Gross profit on amount admitted by the Brush Electric Company to have been realized by it from the business of the Northern Central Railway Company taken by the Brush Electric Company from the United States Company."

It appears that the United States Company had been furnishing the Northern Central Railway with arc lights to light its yards, at 50c. per light per night, and Mr. Wilkins, manager of the railway company, applied to the United States Company for a reduction to 35c., but only obtained a concession to reduce to 45c.—apparently this was in the fall of 1894, after which the Northern Central Railway Company made no further efforts for a reduction from the United States Company, as it regarded this reduction as conclusive on the part of the United States Company. (Wilkins' testimony before auditor, page 5, Ans. 7.)

Subsequently, apparently in the fall of 1895, Wilkins' testimony before examiner, page 64, Ans. 7, the Northern Central Railway Company contemplating a change from gas to incandescent lights at Union Station, requested a bid from the Brush Company and subsequently received a request from Mr. Morrison, the manager of the Maryland Electric Company, asking the privilege of bidding on this contract, and the contract was awarded the Brush Company. (Examiner's testimony, page 65, Ans. 4 x-Q.)

Mr. Wilkins states the reason why the railway company discontinued the service from the United States Company. (Examiner's testimony, page 64, Ans. 9 Q., as follows:)

"Several reasons; chiefly because the Brush Company furnished the arc lights at a lower rate, and because we contemplated introducing incandescent lights at Union Station, and we did not care to make arrangement with two companies for electric lighting, nor to continue the arrangement of receiving incandescent lights through another company; my understanding being that the United States Company only furnished arc lighting."

From the above evidence it would appear, that in the letting

of this contract the railway company desired to deal with the company capable of furnishing both arc and incandescent lights, which latter class of lights the United States Company was not adequately equipped to furnish, and that both the United States Company and the Brush Company found themselves confronted with a competitor in the Maryland Electric Company, which competition the Brush Company was alone able to meet, and so made the best terms it could with railway company.

### Fourth Item of the Account.

Gross profits on business admitted by the Brush Company to have been done by it on Pennsylvania avenue and Patterson avenue.

|            |           |          |
|------------|-----------|----------|
| 1896       | $138 64   |          |
| Interest   | 44 02     |          |
|            |           | $182 66  |

The contention is, that the Brush Company ran its lines on Pennsylvania avenue and Patterson avenue which streets had been previously occupied by the United States Company, and that although the United States Company's lines still remained the company's business was damaged by the Brush Company paralleling its lines on these streets.

Samuel Knouse, Examiner's testimony, p. 39, says: "The United States Company had the first commercial line out Pennsylvania avenue (21 Ans.) and on Patterson avenue (22 Ans.) At present the United States has two arc circuits out Pennsylvania avenue part of the way; one wire goes to Fremont and Pennsylvania avenue and returns to Patterson avenue, then out Patterson avenue to Gilmor or Stricker.

"The Brush has a circuit out Pennsylvania avenue to Patterson avenue, Patterson avenue to Carey street, one arc circuit" (Ans. 23.) Why the Brush Company should be excluded from running its lines a part of the way on the same streets the United States Company had a line on, does not clearly appear to the auditor. The auditor has, therefore, not allowed this claim.

Upon the whole view of the case the auditor finds that there is a "failure to establish the fraudulent design or purpose

alleged to have characterized the various acts and transactions done and instigated " by the directors representing the Brush Company, and he has therefore not allowed any of the claims presented by the complainant.

The auditor was engaged seventeen days in examining the proceedings, reading the testimony and examining a great number of authorities, one of the parties having submitted for his consideration a brief of 71 pages of typewritten legal cap, and the other, one of 9 pages, beside which the auditor had a great number of interviews with the respective counsel in regard to the case.

The auditor has prepared, at the request of the complainant's counsel Account X, but which he does not adopt as his own.

The last account stated by the auditor, Auditor's Account No. 2, filed February 28th, 1898, was ratified in part, and excepted to in part. These exceptions have never been heard, as they are dependent on the decision of the questions now brought before the Court. As the only funds in the hands of the receivers having been distributed by Auditor's Account No. 2, to which exceptions are pending, as stated above, the auditor has not stated any account of expenses or Court costs, but appends a memorandum of his costs.

All of which is respectfully submitted.

R. F. BRENT,
*Auditor.*

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Charles M. Armstrong* and *R. E. Lee Marshall,* for the appellant.

*Randolph Barton* and *Randolph Barton, Jr.* (with whom were *Ambler & Stewart* on the brief), for the appellee.

*R. E. L. Marshall* and *B. B. Shreeves* filed a brief for *Jas. F. Morrison.*

FOWLER, J., delivered the opinion of the Court.

This appeal presents for the second time questions growing out of the alleged maladministration of the affairs of the United States Power and Light Company of Baltimore City by the Brush Electric Company of the same place.   Sometime prior to January, 1893, one Augustus Davis and others, stockholders of the United States Company, filed a bill in the Circuit Court of Baltimore City on behalf of themselves and others for a receiver of the United States Company to prevent it being wrecked as alleged by the Brush Company.   This was the beginning of the litigation which resulted in the appeal which was disposed of by this Court in the case of *Davis et al.* v. *United States Electric Power & Light Co. et al.*, 77 Md. 35. The history of the two companies and the relations existing between them are clearly given by PAGE, J., who delivered the opinion of the Court in the case just cited and we will reproduce it here. The United States Company was supposed to have been incorporated under the general incoporation laws of this State "for the purpose of manufacturing electricity for illuminating and for use as a power and for all other purposes to which electricity or magnetism may be applied and for buying and selling dynamo electric machines   *   *   *.   For a number of years it had been engaged in the business for which it was incorporated in the City of Baltimore   *   *   *.   The Brush Electric Company   *   * was also incorporated under the laws of this State for the purpose of conducting the same business, and, prior to the year 1886, was a rival and competitor of the United States Company in the City of Baltimore.  To prevent the ruinous rate cutting and underbidding, which were the consequences of this rivalry, the Brush Company, in that year, became the *purchaser of the majority of the stock of the United States Company* on the invitation of the latter company or its stockholders.   The affairs of the United Company seem to have been conducted to the satisfaction of both the companies until November, 1891, when the troubles began, which form the subject of complaint.   The bill (in the *Davis case*) alleges that an election was held by the stockholders of the United

States  Company at which was  chosen a board of directors, a majority of whom were persons principally interested in the affairs of the Brush Company, appointed by that company to carry out a policy dictated by the Brush Company as follows, viz.: First, to conduct the affairs of the United States Company "in the interest of, and in order to feed the Brush Company, at the expense of the stockholders, not interested in the said Brush Company ;  second, to permit it to earn only an income sufficient to provide for its running expenses and then to close up the affairs of the United States Company, and dispense with its operations, whenever it shall be found to be to the interest of the Brush Company." All the charges made against the Brush Company as well as the facts alleged to sustain them, were denied by that company, and it was averred in the answer of the Brush Company that so far as the officers and members of the Brush Company had taken part in the affairs of the United States Company they had been governed not only by the desire to give value to the Brush Company's large interest in the United States Company but to deal fairly and honestly with all concerned.

The case of *Davis* v. *The United States Company, supra,* came before this Court on the first appeal on the bill, answer and a large amount of testimony, and we held that the plaintiffs were not entitled to relief and affirmed the decree of the Circuit Court of Baltimore City dismissing the bill.

It appears that very soon after the former bill was dismissed Mr. A. G. Davis, one of the plaintiffs in that case, transferred 217 shares of his stock of the par value of $21,000 to Thomas J. Cannon, the plaintiff in this case, for $500, but Mr. Davis does not remember how this stock was paid for whether in cash or in certain stock of another company. At any rate, whatever may have been the consideration paid by Mr. Cannon he has filed this bill as a stockholder or member of the association of the United States Company re-affirming the charges made in the former bill and adding others of the same character against the defendant, the Brush Company. The bill filed in the case now before us alleges, in general terms,

that for the purpose of using the United States Company for
its own purposes and fraudulently intending, when it was for
the interest of the defendant company, to destroy the plaintiff
company, the plaintiff company was so mismanaged that it
became insolvent and the prayer is, among other things, for
an accounting upon the basis of a partnership ; that a receiver
be appointed to take charge of, protect and preserve the part-
nership property, &c., pending a final decree, and to take such
steps as may be necessary and to wind up the business, &c.,
under the decree of the Court.   Receivers were eventually ap-
pointed and finding, that owing to the crippled condition of
company and the sharp competition for business to which it
was subjected that it could no longer continue its business with
profit, they asked and obtained. leave to sell.   The property
was sold and the net proceeds of sale, together with the earn-
ings of the business while in the hands of the receivers was
distributed among general creditors and bondholders in Sep-
tember, 1897.

In the eighth paragraph of the bill the allegation of the
plaintiff is that believing that the United States Electric Power
and Light Company was a body corporate, the same being
held out as such, he purchased and still holds 217 shares of
the stock of said company ; but that he has lately been in-
formed that said company is not a corporation but a partner-
ship, and that the members of said company stand in the posi-
tion and are subject to the liabilities of partners.

It is conceded by both sides, and indeed the Circuit Court
of Baltimore City so decided, and there has been no appeal
from its decree in that respect, that neither of the two supposed
corporations by the consolidation of which the United States
Company was formed, had ever been legally incorporated and
that hence the consolidated company itself had no legal exist-
ence as a corporate body.

And, therefore, the first and the only question of law pre-
sented by this appeal is, what is the legal relation existing be-
tween the stockholders (so called) of the United States Com-
pany, including, of course, among such stockholders the Brush

Company, which owned three-fourths of the United State's Company's capital stock. The contentions of the plaintiff on this branch of the case are three; first, that the Brush Company in consequence of controlling and managing the property and business of the United States Company stood in the relation of an agent to said United States Company and its members, and owed to it and them the duties of that relation and was subject to its liabilities; or second, if not an agent, then the members of the United States Company, including the Brush Company, were partners *inter sese;* or third, if neither an agent nor a partner, whatever name may be given to such an association as the members of the United States Company constituted, the Brush Company is directly responsible to those members for the acts complained of in this suit.

Remembering that the bill in this case is filed by one of the so-called stockholders of an illegally formed corporation it seems to us very clear that the first two of the plaintiff's contentions cannot be maintained.

In the first place it is nowhere in this case pretended that any of the stockholders of the United States Company ever intended to assume the responsibilities of an agent or a partner or indeed any other responsibility than that of a stockholder in a regularly and legally incorporated company under the laws of Maryland. Under these circumstances the managing stockholders or members of the United States Company cannot be held as agents, for there is no evidence to prove the fact of agency nor does the law imply such a relation under the circumstances of this case; nor can they be held as partners *inter sese*. In the case of *Waring* v. *Natl. Marine Bank of Baltimore*, 74 Md. 278, attention is called to the recognized distinction between a partnership between the parties themselves and a partnership as to third parties which arises by operation of law. "But the question" said the Court "of partnership *inter sese* is one of intention and it may be laid down as a general rule that no such partnership can exist against the consent and intention of the parties. *Bull* v. *Schuberth*, 2 Md. 55." See also *London Ass.* v. *Drennen*, 116 U.

S. 461; *Paul* v. *Cullum*, 132 U. S. 539.    It is apparent from the evidence disclosed by the record not only that no partnership was intended, but that every body connected with the United States Company contemplated the formation of a corporation.    The charter, or what was supposed to be a valid charter, is filed as one of the exhibits with the bill.    It is but equitable, therefore, that the rights of the stockholders or members of the unincorporated association as between themselves should be governed by the terms and conditions and limitations set forth in the paper which they believed and understood to be a charter, that is to say, upon the articles, conditions and provisions therein set forth "and subject in all particulars to the limitations relating to corporations" formed under the general laws of this State.

If we are correct in this conclusion it follows that the rights of the United States Company and the Brush Company must be determined precisely as if both corporations, instead of only the Brush Company had a legal corporate existence. We then have before us the same question which was presented in the case of *Booth* v. *Robinson*, 55 Md. 419, where it was held that the directors of the controlling company and the controlling company itself can be only held answerable for fraud,   or   such   gross   negligence   in   the   management   as amounted to fraud, and that the burden of proof in establishing such mismanagement was upon the plaintiffs.

The only remaining question, then, is whether the proof in this case, in view of what we have said in disposing of a similar appeal in 77 Md. 35, is sufficient to sustain the allegations of the bill now before us.

We have already referred to the fact that the allegations of fact of the present bill are to the same general effect as those of the bill in the former appeal, and the facts relied on in some instances are the same as those adduced to support the allegations of the former bill, together with additional facts not before brought to the attention of the Court.    This branch of the case presents questions of fact, and they have been so fully examined and considered by the learned auditor of the

Circuit Court in his report which was adopted by the Court below after a careful examination of the testimony on which it was based, that we do not deem it necessary to do more than state our conclusions based on our own examination of the record.

In the first place then let us state the grounds upon which the plaintiffs base their claim against the defendant company for nearly $350,000. In his report the auditor reduces them to five general heads as follows, and these five items are the same as those relied on by the plaintiffs in the Account X which was stated at his request. They are as follows :

1st. Total earnings of the Brush Company from all sources from October 13th, 1893, to December 1st, 1894, together with interest amounting to $339,851.01.

On October 13th, 1893, it appears from the testimony, that the plant of the Brush Company was destroyed by fire and the plaintiffs allege that immediately thereafter the United Company was ordered by the Brush Company not to take any more business until further orders by the latter company and that thereupon the Brush Company took possession of the United Company and its works and used them for the benefit and advantage of the Brush Company from October, 1893, to November, 1894, to the great detriment and loss of the United Company. After an examination of the testimony produced to sustain this item of the claim, we entirely agree with the conclusion reached by the auditor and approved by the Court refusing to allow this part of plaintiff's claim below. It appears from the testimony of the plaintiff himself that when the question was considered by the directors of the United Company—a majority of whom it is claimed really were representing the interests of the Brush Company and were put in the directorate for that purpose by the latter company—the sum of $1,500 per month was fixed upon as a reasonable rate per month to be paid by the Brush Company for the use of the power of the United Company in running the Brush Company's machines. The plaintiff objected to this allowance and asked if they (the board) could not make it

$1,550 per month.  The plaintiff testified that Mr. Clark thought the allowance of $1,500 per month was entirely too low "And" quoting "as he thought so I thought so too, and I made the proposition to try to get $50 more and failed," Under these circumstances it is difficult to believe that the plaintiff and those representing the minority and adverse interest in the United Company thought at the time that the amount actually allowed and paid by the Brush Company was unreasonably small, as there was only a demand for the small additional sum of $50.  The clerk and book-keeper of the United Company testified that the day after the burning of the Brush Company's plant "there were a good many calls for lights which we" (the United Company) "did not fill for two reasons ; one was we had an order from the Brush Company not to do anything in the matter of taking lights until we heard from them, and the other was, it was the fall of the year, and we were full of lights and I don't think we had much room to take any.  The company was of small capacity."  But in addition to this it abundantly appears that the Brush Company immediately after the fire installed a 60-light machine at McElderry's Wharf, and one of the defendant's witnesses testified that he was employed at the Brush works prior to and after the fire and that inside of three weeks after the plant was destroyed the Brush Company had at its own works two engines going capable of driving 500 horse-power ; and that before the end of the year two other engines were going, one of about 240 and the other of 124 horse-power. The claim, therefore, that the United Company furnished the whole or any considerable part of the service to the Brush Company from October, 1893, to November, 1894, is far from being sustained by the testimony.  Without further comment therefore upon this item, we are satisfied that the amount agreed upon and paid, viz., $1,500 per month, for the use of the power furnished by United Company to the Brush Company was fair and reasonable.  Nor do we see that there was anything unfair or fraudulent in the action of the majority of directors of the United Company in using the money of the

United Company in redeeming the ground rent on the United Company's works instead of purchasing and installing machinery in the United Company's works so that it could, as alleged, "reap the full benefit of the Brush Company's misfortune" for, as it turned out afterwards, the United Company was unable, even under the energetic management of the receivers, to compete with its rivals for business.   Two other companies besides the Brush Company were in the field, and it necessarily followed that in the face of such competition the weakest company would go under.

2. The second item of the plaintiff's claim against the defendant, the Brush Company, relates to the receipts from the North Avenue and Lake Roland Elevated Railway Companies from January 1st, 1892, to June 30th, 1893.   The claim, on the part of the plaintiff, is that the United Company is entitled to the whole of the money derived by the Brush Company with interest thereon, amounting to $13,453.62, because the Brush Company fraudulently deprived the United Company of the contract to serve the power to the railroad companies. This is substantially the same claim set up in the former appeal (77 Md. 35), where it was held that the contract was "lost by a policy which was adopted by the officers of the United Company, inaugurated for the benefit of that company," and that the Brush Company was not guilty of any fraudulent attempt to injure the United Company.   The auditor also disallowed the plaintiff's claim based upon the theory that 66 per cent of the cost of operating the generators of the North Avenue Railway Company was an unjust discrimination against the United Company.   Upon the testimony in the record quoted by the auditor and for the reasons given by him in his report we entirely agree with him, that this claim was properly disallowed.   Speaking of this same transaction we said in 77 Md.:   " The proof leaves it somewhat in doubt as to whether that company" (the United Company) "incurred loss in supplying the power under the new contract ; the weight of the evidence, in our opinion, being that it did not.   But it is shown that no complaint was ever made to the Brush Company

or to anyone, that such was the fact." "The United Company," says the auditor, "continued to operate under these terms and to receive the 66 per cent." He therefore, as we have seen, refused to allow this second item of the defendant's claim, and we think he was right.

3. The third item is for gross profit on amount admitted by the Brush Company to have been realized by it from the business of the Northern Central Railway Company alleged to have been unfairly taken from the United Company by the Brush Company. This item amounts to $2,019.37. We have examined the testimony adduced to support this part of the plaintiff's claim and without discussing it in detail, we think it was properly disallowed.

4. The fourth item of the plaintiff's claim is for gross profits on business admitted by the Brush Company to have been done by it on Pennsylvania avenue and Patterson avenue in 1896 amounting to $182.66. This item appears to be based upon the theory that inasmuch as the United Company was the first to extend its lines on those streets—the Brush Company had no right to use them to serve its own customers. Surely the fact that the Brush Company owned a controlling interest in the United Company did not destroy the right it would otherwise have had to honestly and fairly compete with the United Company. We know of no principle of law regulating corporations situated as these two were which would sustain this contention of the plaintiff.

5. The fifth and last item of the plaintiff's claim is thus stated by him: Gross profits on earnings admitted by the Brush Company to have been made by it from sundry customers of the United Company, diverted from it by the Brush Company, viz: 40 per cent on $6,158.94 amounting to $3,245.81 including interest. A claim similar to this was discussed in the former appeal in reference to the order that all applications for lights should be referred to the secretary of the Brush Company. It was held in 77 Md. 46, that the weight of testimony was to the effect that in deciding which company should take a contract a reasonable fairness was observed.

" We do not undertake," continued the Court, " to pass upon the correctness of  *   *   *   the decision in each particular case so referred ; it is sufficient to say that we find nothing that would justify a Court in holding there was anything fraudulent on the part of the Brush Company or its alleged representative."

This was the conclusion reached on the testimony before us in the former appeal, and we have failed to find any evidence taken in these proceedings which would justify a different conclusion now.

It follows from what we have said that we entirely agree with the learned Court below and the order appealed from will be affirmed.

The report of the Auditor accompanying the account which was ratified discusses the facts so fully and clearly that we will request the Reporter to include it in the report of this case.

*Order affirmed with costs.*

(Decided January 22nd, 1903.)